[No. S016719. July 17, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH MICHAEL YEOMAN, Defendant and Appellant.

COUNSEL

Charles M. Bonneau, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—A jury found defendant Ralph Michael Yeoman guilty of the first degree murder of Doris Horrell and found true the special circumstance that the murder occurred during the commission of a robbery. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(A).)[1]

The jury also found defendant guilty of robbery and false imprisonment (§§ 211, 236) and found true the allegation that, in each of these crimes, defendant personally used a firearm (§ 12022.5). The jury found not true the additional special circumstance that the murder occurred during the commission of a kidnapping. (§ 190.2, subd. (a)(17)(B).) The jury imposed the sentence of death. The trial court stayed the convictions for robbery and false imprisonment under section 654, struck the enhancements under section 1385 and entered judgment accordingly. This is the automatic appeal from that judgment. (§ 1239, subd. (b).) We affirm.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Murder of Doris Horrell*

Defendant robbed and murdered Doris Horrell, a 73-year-old resident of Citrus Heights, on February 13, 1988. Sheriff's deputies found her body about 9:40 p.m. in an open field west of Interstate 5 in Sacramento County, while setting flares to direct traffic out of the Arco Arena. Horrell had left a Valentine's Day party earlier that evening in her car to pick up an acquaintance at the airport. She was wearing a bright red dress, jewelry and designer eyeglasses. Police found no jewelry, eyeglasses, keys or purse. Nor did they find a coat, but they did find three lavender-colored buttons. Postmortem examination revealed the cause of death as six gunshot wounds to the head and left side of the body, any of which could have been fatal. The shots had been fired at close range from a .22-caliber gun. Horrell's inoperable car was later towed from the side of the freeway, about four miles from the place where her body had been found. Investigators determined that a palm print on the hood of Horrell's car was defendant's and that the fatal bullets had the general characteristics of rounds fired from defendant's .22-caliber revolver.

On February 16, 1988, Debra Stafford called the Sacramento County Sheriff's office and reported that defendant was Horrell's killer. Stafford told the following story, which she repeated at trial. On the evening Horrell died,

---

[1] All further citations to statutes are to the Penal Code, except as noted.

Stafford and defendant were visiting defendant's friend Ron Kegg at his Sacramento apartment. Defendant left the apartment alone in his pickup truck about 7:30 p.m., saying he needed "[t]o go get some money." He returned about an hour later, telling Stafford, "[w]e have got to hurry, go." Stafford left with him. On the road, defendant explained the situation. "He told me," Stafford testified, "that he needed me to help him, that he murdered a lady and he wanted me to drive his truck while he went to the car that was sitting on the side of the freeway and needed to drive it off . . . ." Defendant said "he had fingerprints on the car" and needed to "clean it up." Defendant had stopped for Horrell "[b]ecause she was dressed nice and she looked like she might have some money." She "was broke down on the freeway and he stopped to help her," but "he couldn't get her car started so she got in the truck. He was going to give her a ride, and he killed her." Stafford perceived defendant as calm while he recounted these events.

Arriving at Horrell's car, defendant found it still would not start. He used Stafford's shirt to wipe his fingerprints off the car, and cleaned the windows with a fire extinguisher and squeegee from the trunk. Driving away, defendant pointed a gun at Stafford and told her that he had shot Horrell "sitting where you are sitting." He said he had used a .22-caliber pistol and had "emptied the clip in her." Stafford noticed a very small amount of blood on the floor of the truck. Defendant then took her to see Horrell's body. Stafford did not want to go, but defendant insisted, saying, "well, I want to go see it and see if they found it yet." On the way, Stafford looked through Horrell's purse and noted her name. Defendant stopped his truck near the Arco Arena, where flares had been set to guide traffic. Horrell's body had not yet been discovered. Defendant shone a light, and Stafford saw the body of an older woman with gray hair wearing a red dress.

After seeing the body, defendant said he wanted to visit Horrell's apartment and try to withdraw money from her bank. Defendant showed Stafford rings and earrings he had taken from Horrell, along with $20 and a light purple coat. After stopping briefly at Kegg's apartment, defendant drove to Horrell's address in Citrus Heights using information from her purse. Defendant threatened to kill Stafford or have her killed if she turned him in. Arriving at Horrell's apartment complex, defendant explained that he wanted to "go in, grab the jewelry box and TV and leave." But the area was too brightly lit and too many people were about, so he abandoned this plan. Next, the two attempted to withdraw money from an ATM machine using Horrell's bank card but failed for want of her PIN number. Finally, they drove to Stafford's home in Marysville where, after searching the purse one last time for a PIN number or other useful information, they burned most of Horrell's effects. They kept her jewelry, coat and a few other items. Defendant tried to give the coat to Stafford, but she would not take it. She noticed bullet holes and powder burns under the left armpit. Buttons were missing.

A day or two later, defendant arrived at Stafford's house with Kegg. The two men attempted to persuade her to go with them to Sacramento, but she refused. Afterwards, defendant called her repeatedly with the same request. Scared, Stafford spoke with her father. At his suggestion she called the United States Marshall, who put her in touch with Deputy Sheriff John Cabrera. Searching Stafford's house, Deputy Cabrera and other officers found Horrell's fire extinguisher, squeegee and lipstick holder, and a brochure for a recreational area in South Dakota where Horrell's family owned property. In Stafford's fire pit, officers found eyeglasses and documents that, while burned, could still be identified as Horrell's. That same day, police arrested defendant and Kegg. Defendant had the parts of a .22-caliber revolver in his pocket. Kegg subsequently turned over Horrell's jewelry to the police.

Stafford, when called by the People as a witness at trial, was serving a 90-day sentence for a misdemeanor drug offense; she had previously been convicted of felony failure to appear. She testified that the People had offered no consideration, promises or help in exchange for her testimony. So far as she knew, she might still be prosecuted for her conduct with defendant. Kegg, also called as a witness by the People, had suffered a felony conviction for burglary and several felony convictions relating to drugs.

The defense endeavored to show that defendant was under the influence of methamphetamine at the time he killed Horrell and did not form the intent to steal until after killing her. On direct examination by the People, both Stafford and Kegg denied seeing defendant use drugs on the day he killed Horrell. Stafford and Kegg also testified on direct that defendant appeared to be calm, behaving normally and apparently making sense. At the preliminary hearing, however, Kegg had testified that both he and defendant were using methamphetamine heavily during that general period of time. Kegg had also previously testified that defendant arrived at his house seeming "wired," frantic and confused. After refreshing his memory with this prior testimony, Kegg explained that his own use of drugs had probably impaired his perception of defendant.

Lorraine Andrews, R.N., called by the defense, described her routine medical examination of defendant as an inmate at the Sacramento County jail. Defendant reported to Andrews that he had been on a "drug run," that he used cocaine, heroin, methamphetamine, LSD and marijuana, and that he had recently lost 50 pounds. Defendant had injection scars, or "tracks," but Andrews could not say how old they were. Andrews drew a sample of defendant's blood, but tested it only for communicable diseases and not for drugs.

A defense expert witness, Dr. Fred Rosenthal, M.D., Ph.D., opined that defendant "very likely" was using methamphetamine at the time he killed

Horrell. Dr. Rosenthal, a psychologist and psychiatrist, had not interviewed defendant and did not know his criminal history. Instead, Dr. Rosenthal based his opinion on factual materials supplied by defense counsel, including the preliminary hearing transcript, the statements of witnesses, and a videotaped interrogation of defendant by police on February 16, 1988, three days after the crime occurred. The trial court permitted the defense to play the videotape for the jury without sound to show defendant's demeanor, which Dr. Rosenthal described as sleepy and thus indicating long-term methamphetamine use. The trial court also permitted Dr. Rosenthal to repeat, as part of the basis of his opinion, defendant's statement on the tape that he was puzzled about what had happened. In Dr. Rosenthal's opinion, a person whose thinking was disorganized by methamphetamine would not likely be able to form the plan to pose as a good Samaritan in order to rob and kill a stranded motorist. Dr. Rosenthal acknowledged, however, the "unlikely" possibility that a methamphetamine user could form the intent to kill and steal.

### 2. *The Robbery and Attempted Kidnapping of Geraldine Ford*

During the guilt phase, the People proved that defendant had previously robbed and attempted to kidnap another female motorist, Geraldine Ford. The trial court admitted this evidence under Evidence Code section 1101, subdivision (b), to show defendant's intent with respect to Doris Horrell.

The crime occurred on January 4, 1988, in the parking lot of a Target store in Sacramento. Ford, an auditor for the California Highway Patrol, had been shopping. While she was inside the store, the sun had gone down and the lights in the parking lot had come on. Backing her car out of a parking slot, she realized the car had a problem. Defendant approached, pointed out a flat tire and offered to change it. Ford noted defendant's general description and a flower tattoo on the back of his hand. After finishing the job, defendant returned the tools to the trunk of Ford's car. Ford saw a gun tucked into the waistband of defendant's pants and asked whether he was in law enforcement. He replied that he worked for the county. Ford thanked him, and he followed her to the open driver's side door of her car. He then held a gun and a knife to Ford's stomach, told her to get into his truck and said, "don't run or I will shoot you. And don't scream or I will stab you." Saying, "you've got to be kidding; I'm not getting into your truck," Ford backed away, ran and then hid behind another vehicle. Defendant grabbed her purse from the driver's seat of her car and fled in his pickup truck.

Ford's purse contained, among other things, two distinctive rings and a Sprint telephone card. Defendant gave the rings to Patricia Weers, who sold one to Debbie Yoast. Defendant later asked Weers to return the ring she had

kept, explaining that it might incriminate him in an offense against a woman who worked for the California Highway Patrol. Police eventually recovered the other ring from Yoast. Defendant used Ford's previously unused Sprint telephone card to charge calls to his friend Ron Kegg. After police arrested defendant for the murder of Doris Horrell, Detective Craig Trimble visited him in prison. When the detective told defendant he was investigating a robbery at a Target store and had a lead involving the victim's Sprint card, defendant replied, "You are on the right track." That same day, Ford identified defendant as her assailant in a photographic lineup. She later identified him in court as well.

The People proved this incident through the testimony of Geraldine Ford, Patricia Weers and the investigating officers. The defense focused on challenging Ford's identification of defendant.

## B. *Penalty Phase*

### 1. *The Aggravating Evidence*

The People's evidence in aggravation consisted of the circumstances of the capital offense (§ 190.3, factor (a)), three prior felony convictions (*id.*, factor (c)) and five incidents of criminal activity involving violence or a threat of violence (*id.*, factor (b)). One such incident was the robbery and attempted kidnapping of Geraldine Ford, which the People had proved at the guilt phase and as to which they offered no additional evidence at the penalty phase.

#### a. *The robbery of James Jacobs*

On March 2, 1976, defendant entered the home of his 91-year-old neighbor, James Jacobs, on the ruse of needing to borrow a plunger. Inside, defendant cut the telephone cord, slit Jacobs's throat with a four-inch folding knife, ransacked the house and stole a variety of pain medications and anticonvulsives. Defendant reported these events to his brother Steve Yeoman, who informed the police over a year later. Defendant subsequently admitted the crime and, in 1977, pled guilty to robbery with great bodily harm. (§ 211.) The People proved the crime and its violent circumstances through official records and the testimony of witnesses. These included Steve Yeoman, the housekeeper who rendered first aid, the police officers who responded to the call and investigated the crime scene, and the detective who interviewed Steve Yeoman and heard defendant's confession. The court admitted this evidence as showing both violent criminal activity (§ 190.3, factor (b)) and a prior felony conviction (§ 190.3, factor (c)).

On direct examination, Steve Yeoman made conflicting statements about whether defendant had bragged of hurting Jacobs, ultimately acknowledging

"[h]e may have, but it was the drugs that was making him brag." Defense cross-examination focused on defendant's heavy use of drugs and subsequent expressions of remorse for the crime.

### b. *The molestation of Sharon C. and Duane C.*

At the same time defendant pled guilty to the robbery of James Jacobs, he also pled guilty to the crimes of lewd and lascivious conduct (§ 288) against his stepdaughter Sharon C., and oral copulation of Sharon's brother, Duane C. (§ 288a). The People proved these prior felony convictions (§ 190.3, factor (c)) through official records. Because defendant's crime against Sharon had involved a threat of violence, the court also admitted evidence of its factual circumstances as showing criminal activity. (§ 190.3, factor (b).) The People proved the circumstances through the testimony of Sharon, herself, and of the investigating officer.

Sharon testified that defendant molested her from the time she was 10 until she was 13. She did not initially know defendant's conduct was wrong. At the age of 13, however, she confronted him. Defendant said that if she told anyone, her mother would not believe her, the family would be broken up, and this would be her fault. Defendant also threatened to kill her. Sharon believed him because he had beaten both her mother and herself. On defense cross-examination, Sharon acknowledged that she had not reported defendant's threats to the investigating officer. On redirect, she explained that she had not done so because the investigating officer had guaranteed her that defendant would be out of the home and in jail. The record does not reflect Duane C.'s precise age at the time defendant molested him. Sharon testified he was four to five years younger than she.

### c. *The rape of Linda E.*

In 1968, while defendant was in the United States Army, he forcibly raped the wife of a friend and fellow soldier then serving in Vietnam. The court admitted this evidence as showing prior violent criminal activity (§ 190.3, factor (b)) but not a prior felony conviction (*id.*, factor (c)), because the parties had agreed that convictions in courts-martial were not admissible for that purpose. The People proved the rape through the testimony of the victim Linda E., portions of the transcript of the court-martial, and the stipulation that defendant had in that proceeding admitted a forcible rape.

The relevant evidence showed that defendant was stationed at Fort Riley, Kansas, in a special detachment for soldiers who had been absent without leave. Linda's husband, who was defendant's friend, had left for Vietnam a week earlier. On August 3, 1968, Linda, defendant and a soldier named Elliot

drove Linda's car to a park on the base. As planned, the two men spent the afternoon there replacing the car's damaged door. The men drank wine as they worked, but Linda did not. After finishing the work, all three drove to a more remote location on the base where defendant and Elliot wanted to drink beer. Linda had planned to drop them off and leave, but defendant would not relinquish her ignition key. She got out of the car, started walking away and then ran, but defendant caught her. Defendant threatened her with a hunting knife, and both men raped her. Afterwards, defendant told Linda he would kill both her and her husband if she turned him in.

Cross-examining Linda, the defense attempted to suggest that the rape was a ruse intended to support her effort to obtain a hardship discharge for her husband. The defense also sought to prove that Linda earlier in the day had implicitly offered defendant consensual sex by agreeing to his proposal that he would fix the car's door if she would "supply the beer and the company." Linda denied this.

### d. *The killing of David Hill*

On January 14, 1988, a month before killing Doris Horrell, defendant killed David Hill. Although defendant was not charged with that crime in this proceeding, the court admitted the evidence as showing criminal activity involving force or violence. (§ 190.3, factor (b).)

Hill operated an automobile repair business out of his home in Roseville. He also sold drugs. On January 15, Hill was found dead on his living room floor. The house had been ransacked in a manner suggesting a search for drugs. Postmortem examination of Hill's body revealed two gunshot wounds, one to the head and one to the neck and shoulder. The fatal slugs had fragmented and could not be identified. A spent slug found in the wall, however, bore marks showing it could have been fired from any Smith & Wesson .38-caliber weapon.

Hotel records and other evidence showed that defendant had stayed at the Best Western Roseville Inn from January 14 to January 15, 1988. On January 14, defendant called his friend Ron Kegg from the motel and asked for a ride. In defendant's room, Kegg saw an attache case full of methamphetamine and a large amount of cash. Defendant also had a distinctive short-barreled .38-caliber revolver with custom fat grips and a shrouded hammer (i.e., no spur), similar to a Smith & Wesson that defendant's brother-in-law Michael Ayers later reported stolen. Defendant and Kegg injected some of the methamphetamine and left in Kegg's car. Kegg dropped defendant off at a medical building in Roseville, less than half a mile from Hill's house. Hill was found dead the next day, January 15. Hotel records showed that

defendant checked out on January 15 at 10:49 a.m. A blue Mercury Monarch that witnesses had seen at Hill's house on the afternoon of January 14, loaded with household goods, was found abandoned at the motel and subsequently impounded by police.

Four months later, police recovered several items that had belonged to Hill from the home of defendant's stepmother, Roberta Yeoman. Roberta had removed these items from defendant's rented storage locker at his request. The items were identified by Hill's girlfriend, Monique Hubertus. Hubertus had lived in Hill's house with her children since 1985 and had moved out only recently, after Hill developed problems with drugs and alcohol. The items Hubertus identified included, among many other things, a distinctive handmade knapsack, Hubertus's own diaper bag, and a yellow ski vest she had bought for Hill and for which she still had the receipt. Hubertus also identified as Hill's several items found on defendant's person, including Hill's San Francisco Forty-Niners wallet and his black Uniroyal jacket. Keys found at Roberta Yeoman's house, and other keys found in defendant's possession when he was arrested, fit automobiles that had been seen on Hill's property on the day he died. One of these was the blue Mercury Monarch police had impounded at the Roseville Inn.

At some point before February 16, 1988, when he was arrested for the murder of Doris Horrell, defendant admitted to his brother-in-law Michael Ayers that he had shot Hill. Ayers, however, did not believe this. After he was arrested, defendant twice again admitted the killing in telephone calls from jail to his sister Linda Ayers. In those conversations, defendant described Hill as "a no good drug dealer."

The People proved these events through the testimony of Ron Kegg, Michael Ayers, Linda Ayers, Roberta Yeoman, Monique Hubertus, other persons who could identify Hill's possessions, the manager of the Roseville Inn, the man who discovered Hill's body, the investigating officers, medical and firearms experts, and other witnesses.

The defense focused on suggesting that various persons other than defendant might have killed Hill. Jason Montgomery visited Hill's home a few days after Christmas 1987 and saw him arguing about money with two heavy-set "Spanish looking" men. The men had driven a white Trans Am. Montgomery saw the same Trans Am at Hill's house again on January 13. He described the driver, whom he could not positively identify, as " similar" to a photograph of Michael Ayers. On January 14, the day Hill died, Carol Grabowsky saw a stocky, well-dressed man leaving Hill's house about 1:00 p.m. Sometime in the early afternoon, Robert Connors saw a young man with unkempt clothes kneeling down on the sidewalk across from Hill's house

looking extremely nervous and frightened. Dawn Worley saw a two-toned blue car driving away from Hill's house between noon and 2:00 p.m. Arthur Bracco, a mailman, saw Hill alive at 3:00 p.m., speaking with another man who stepped into the shadows to avoid being seen. Finally, Carla Nebeker saw a man with shoulder-length hair staggering away from Hill's house about 6:00 or 7:00 p.m. But other witnesses testified that Hill's automobile repair business had caused his property to look like a used car lot, with much traffic during the day and someone working on cars at all times, day and night.

The defense also called Lori Bakos, who testified that William Summers and James Baxter had bragged of shooting Hill in the head and using their knives to remove the bullets. The two men said this, Bakos claimed, on the evening of January 14 in Bob Bragg's upholstery shop. But Baxter and Summers, called by the defense as witnesses, denied this. Bakos's story also conflicted with the physical evidence, which showed that the single slug entering Hill's skull had fragmented and remained in place until the autopsy. Bakos also claimed to be "an undercover police officer" but retracted the claim on cross-examination, describing herself instead as an "informant." The officers for whom she claimed to have worked, Officers Frederick Rockholm and Tod Call, described her as unreliable and tending to fantasize. Bakos had once reported a homicide at a specific location, but no body could be found and her information could not be linked with any reported crime. Officer Rockholm had on a single occasion unsuccessfully attempted to use Bakos to make a controlled buy of narcotics. He had not, however, contrary to Bakos's testimony, ever asked a judge to make her a "legal informant," a term with which he was unfamiliar.

On rebuttal, the People further challenged Bakos's credibility. Lieutenant Joel Neves, who investigated Hill's death, testified that Bakos had earlier told a different story. On February 16, 1988, one month after Hill died, Bakos told Lieutenant Neves, Detective Brian Wilder and Officer Darrell Stump that the killing had resulted from a drug war between rival organizations led by Bob Bragg and Robert Welch, and that the actual killer was Kevin Ray Pool. Bakos did not mention Summers or claim that he and Baxter had killed Hill. Later, Bakos said that she had allowed Pool to move in with her in order to learn more about Hill's murder. After a week, she retracted her claim that Pool was responsible and said she did not know who the murderer was.

### 2. The Mitigating Evidence

The defense mitigating evidence, in summary, showed that defendant had suffered serious physical and sexual abuse in childhood that affected his development and behavior and possibly caused brain damage. Correctional personnel and former employers testified that defendant was a good worker. Defendant's stepdaughter testified that he had saved her daughter's life.

More specifically, defendant's family lived in Tyler, California, near Nevada City. They were extremely poor. They had little to eat and took clothing and toys from the dump. Defendant's father, Ralph Yeoman, called defendant a bastard and claimed his true father was Ralph's brother, Cliff. Ralph beat his wife and children, including defendant, frequently and brutally. Defendant's brother Terry Lumsdon once saw Ralph break a two-by-four over defendant's back and head, and various witnesses saw him kick defendant repeatedly in the head. Ralph sexually molested both his daughters and defendant. When defendant was nine, Ralph attempted to penetrate him sexually. Defendant's uncle Richard gave him alcohol and engaged him in oral copulation. When defendant was 14, his mother had sexual intercourse with him after finding her husband in bed with another woman.

Dr. Mindy Rosenberg, Ph.D., a psychologist, testified extensively about defendant's personal and family history and its effect on his personality and psychological development. Dr. Rosenberg explained that persons who have experienced very serious physical, sexual and psychological abuse as children are at greater risk for experiencing a wide range of later problems, possibly including violent behavior. While Dr. Rosenberg would not say that defendant's abusive childhood had caused his criminal behavior, she did opine that the severity and brutality of the abuse he suffered had affected him significantly.

Correctional officers and employees who had supervised defendant in various institutions consistently testified that he was a helpful, good worker who did not cause trouble. While in custody as a mentally disordered sex offender at Atascadero State Hospital, defendant held responsible jobs working in an office, helping to process new arrivals, and assisting with building maintenance. In the latter job, defendant was cleared for access to sharp tools. While imprisoned at Soledad State Prison, defendant worked in the kitchen and was considered sufficiently reliable to be released for work during lockdowns. Two private employers, both in the roofing business, also testified that defendant was a good worker. One of these employers, David Petrali, had discussed the Bible with defendant and believed he had a deep interest in religion.

Dr. Arthur Kowell, M.D., a neurologist, interpreted the results of a BEAM (brain electrical activity mapping) test performed on defendant. Dr. Kowell opined that the test results showed a dysfunction in defendant's temporal or left parietal lobe consistent with childhood physical abuse.

Cynthia Witt, defendant's stepdaughter, testified that defendant had helped to care for her young daughter Brandy during a severe illness and had saved her life with mouth-to-mouth resuscitation. Out of gratitude, Cynthia named her son Derek Michael after defendant.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Challenges for Cause*

Defendant claims the trial court deprived him of due process and a fair trial by denying his challenges of four prospective jurors for cause.[2] None of the four sat on defendant's jury because he peremptorily challenged each. Defendant eventually exhausted his peremptory challenges and expressed dissatisfaction with the jury. While the claim is thus properly before us, we may reject it without examining the merits of defendant's challenges for cause because defendant cannot show prejudice.

 To prevail on such a claim, defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) None of the four prospective jurors could possibly have affected the jury's fairness because none sat on the jury. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1159 [64 Cal.Rptr.2d 892, 938 P.2d 950]; see *Ross v. Oklahoma* (1988) 487 U.S. 81, 85–86 [101 L.Ed.2d 80, 108 S.Ct. 2273].) The harm to defendant, if any, was in being required to use four peremptory challenges to cure what he perceived as the trial court's error. Yet peremptory challenges are given to defendants subject to the requirement that they be used for this purpose. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [270 Cal.Rptr. 451, 792 P.2d 251].) While defendant's compliance with this requirement undoubtedly contributed to the exhaustion of his peremptory challenges, from this alone it does not follow that reversible error occurred. An erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant *"can actually show that his right to an impartial jury was affected . . . ."* (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659], italics added.) In other words, the loss of a peremptory challenge in this manner " 'provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.'* " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487 [117 Cal.Rptr.2d 45, 40 P.3d 754], italics added, quoting *Ross v. Oklahoma, supra,* at p. 89; cf. *United States v. Martinez-Salazar* (2000) 528 U.S. 304, 315–317 [145 L.Ed.2d 792, 120 S.Ct. 774].) Here, defendant cannot show his right to an impartial jury was affected because he did not challenge for cause any sitting juror. No incompetent juror was forced upon him.

---

[2] Rollend F., Larry J., Deborah P. and Laura P.

### 2. *Wheeler Motion*

Defendant claims the trial court erroneously denied his motion for a mistrial under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] *(Wheeler)*. In the motion, defendant asserted the People had peremptorily challenged four African-American prospective jurors on account of their race. The motion would more properly have been brought as a motion to dismiss the venire, but this procedural irregularity has not prevented us from considering similar claims in other cases. (See *People v. Williams* (1997) 16 Cal.4th 635, 662, fn. 9 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Mayfield* (1997) 14 Cal.4th 668, 722, fn. 7 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

Defendant presented his motion orally, after the 12 trial jurors had been selected but not yet sworn. Defendant's entire presentation on the motion consisted of naming the four prospective jurors in question, noting their juror numbers, occupations and race, and citing our decision in *Wheeler, supra*, 22 Cal.3d 258. The court deferred its ruling in order to give the motion "more than cursory attention" and to review the record. The court thereafter entered a written order finding no prima facie case of group bias as to three of the four prospective jurors and directing the prosecutor to explain his reasons for challenging one. When the prosecutor offered his explanation, the court declared itself satisfied and denied the motion. The jury as sworn included 11 jurors who identified themselves as "White" or "Caucasian" and one who identified himself as "Black."

In finding that defendant had failed to demonstrate a prima facie case of group bias as to the first three prospective jurors, the trial court did not err. Such a demonstration entails, at the least, making as complete a record as feasible of the relevant circumstances, establishing that the excluded persons belong to a cognizable group, and showing that the other party has more likely than not exercised its peremptory challenges because of group association rather than any specific bias. *(People v. Johnson* (2003) 30 Cal.4th 1302, 1310, 1316, 1318 [1 Cal.Rptr.3d 1, 71 P.3d 270]; see *Wheeler, supra*, 22 Cal.3d 258, 280.) Defense counsel's cursory reference to prospective jurors by name, number, occupation and race was insufficient. It was no more helpful to the court than the similarly cursory presentation we held insufficient in *People v. Howard* (1992) 1 Cal.4th 1132, 1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315], where counsel relied exclusively on the fact that the prosecutor had challenged the only two African-American prospective jurors without making "any effort to set out the other relevant circumstances, such as the prospective jurors' individual characteristics, the nature of the prosecutor's voir dire, or the prospective jurors' answers to questions."

When a trial court denies a motion under *Wheeler, supra,* 22 Cal.3d 258, after finding no prima facie case of group bias, we consider the entire record of voir dire for evidence to support the trial court's ruling. If the record suggests grounds upon which the prosecutor might reasonably have challenged the prospective jurors in question, we affirm. (*People v. Johnson, supra,* 30 Cal.4th 1302, 1325; *People v. Howard, supra,* 1 Cal.4th 1132, 1155.)

Here, the record does indicate grounds on which the prosecutor might reasonably have challenged each of the three prospective jurors as to which the trial court found no prima facie case of group bias. While each of the three prospective jurors gave appropriate answers to oral questions intended to confirm his or her willingness to follow the court's instructions and to vote for the death penalty if appropriate, each prospective juror's written responses to the jury questionnaire might reasonably have caused the prosecutor to prefer other jurors. For example, Prospective Juror Margaret B., a 42-year-old surgical nurse, indicated on her questionnaire that she "would not like to sit as a juror," "cannot judge another," and felt "frustrated" that "the Supreme Court is far to the right." Theresa H., a 32-year-old computer system administrator, indicated on her questionnaire that she had not favored the 1978 initiative reinstating the death penalty, and that the causes of and solution to "crime problems," respectively, were "haves and have nots" and the "possibility of socialism." Vera Mae M., a 52-year-old seamstress, left blank several of the questions intended to explore her attitudes towards crime and capital punishment, including the questions "What is your attitude towards the death penalty?" and "Did you favor the 1978 Briggs Initiative which reinstated the death penalty in California?" Because the record suggests these race-neutral reasons why the prosecutor might reasonably have preferred other jurors, the trial court's decision not to find a prima facie case as to these prospective jurors must be affirmed. (*People v. Howard, supra,* 1 Cal.4th 1132, 1155.)

Defendant disputes this conclusion, asserting that jurors and prospective jurors the prosecutor did not challenge gave responses comparable to those he did challenge. Defendant did not, however, present a comparative juror analysis to the trial court. We recently reaffirmed in *People v. Johnson, supra,* 30 Cal.4th 1302, 1318–1325, our understanding that a reviewing court should not attempt its own comparative juror analysis for the first time on appeal.

Turning to the single prospective juror as to whom the trial court did find a prima facie case, we find no flaw in the trial court's subsequent determination that the People's peremptory challenge was based on factors other than group bias. The prospective juror in question was Isaac J., a 43-year-old correctional

officer at the California Medical Facility at Vacaville. Concerning Isaac J., the prosecutor explained that he had "opted towards jurors, all twelve in that box, who have stronger death penalty views." Isaac J., the prosecutor explained, had not answered written questions intended to explore his attitude toward the death penalty and had testified on voir dire that he had not given the subject much thought. For the trial court to accept this explanation was reasonable because the record supported the prosecutor's assertions about the prospective juror's responses, and because the prospective juror's apparent ambivalence towards the death penalty had been the exclusive subject of the prosecutor's questions to him on voir dire.

For the first time on appeal, defendant asserts a claim under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), in which the high court held that the equal protection clause of the Fourteenth Amendment to the United States Constitution forbids prosecutors to exclude prospective jurors on account of their race. In the trial court, defendant cited only *Wheeler, supra,* 22 Cal.3d 258, which interprets the representative cross-section requirement of article I, section 16 of the California Constitution. (*Wheeler, supra,* at pp. 276–277.) The People contend defendant waived his federal claim by failing to raise it below. The decisions in *People v. Garceau* (1993) 6 Cal.4th 140, 173 [24 Cal.Rptr.2d 664, 862 P.2d 664], and *People v. Ashmus* (1991) 54 Cal.3d 932, 987 [2 Cal.Rptr.2d 112, 820 P.2d 214], support the People's position. In more recent cases, however, we have not held that defendants waived *Batson* claims by citing only *Wheeler* at trial. Instead, we have simply observed that *Wheeler* and *Batson* articulate the same standard and, after deciding the *Wheeler* claim on its merits, rejected the *Batson* claim as moot. (*People v. Farnam* (2002) 28 Cal.4th 107, 139, fn. 11 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *People v. Catlin* (2001) 26 Cal.4th 81, 117, fn. 4 [109 Cal.Rptr.2d 31, 26 P.3d 357].) More recently, in *People v. Johnson, supra,* 30 Cal.4th 1302, we reached the merits of the defendant's *Batson* claim without suggesting that he somehow forfeited that claim by failing to cite *Batson* at trial.

■ Consistently with these recent cases, we believe that to consider defendant's claim under *Batson, supra,* 476 U.S. 79, is more consistent with fairness and good appellate practice than to deny the claim as waived. As a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal. Defendant's *Batson* claim is of that type. ■ His motion under *Wheeler, supra,* 22 Cal.3d 258, required the trial court to conduct the same factual inquiry required by *Batson* into the possibly discriminatory use of peremptory challenges, and to apply a standard identical to *Batson*'s for

determining whether defendant had stated a prima facie case. (See *People v. Johnson, supra,* 30 Cal.4th 1302, 1312–1318.) Under these circumstances, the *Batson* claim is properly cognizable on appeal by analogy to the well-established principle that a reviewing court may consider a claim raising a pure question of law on undisputed facts. (E.g., *People v. Hines* (1997) 15 Cal.4th 997, 1061 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512]; *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) While defendant does dispute the trial court's resolution of the factual issues underlying his *Batson* claim (i.e., whether he stated a prima facie case and whether the prosecutor's explanation was adequate), the same factual issues are properly before us already because of defendant's timely *Wheeler* motion. Under these circumstances, to consider the *Batson* claim entails no unfairness to the parties, who had an opportunity to litigate the relevant facts and to apply the relevant legal standard in the trial court.[3] Nor does it impose any additional burden on us, as the reviewing court.

Accordingly, we may properly consider defendant's *Batson* claim on the merits. Doing so, we conclude it fails for the same reason his *Wheeler* claim fails.

Defendant's unelaborated citations to the Fifth, Sixth and Eighth Amendments to the United States Constitution add nothing to his argument. *Holland v. Illinois* (1990) 493 U.S. 474 [107 L.Ed.2d 905, 110 S.Ct. 803], which defendant also cites, provides no conceivable support for his objection to the People's use of peremptory challenges. ■ In *Holland*, which has been applied retroactively (*Bell v. Baker* (6th Cir. 1992) 954 F.2d 400, 401–402, cert. den. (1992) 506 U.S. 984 [121 L.Ed.2d 429, 113 S.Ct. 491]), the high court held that the Sixth Amendment does not preclude litigants from using their peremptory challenges to exclude members of cognizable racial groups from petit juries.

### 3. *Motion for Additional Peremptory Challenges*

Defendant moved at trial for additional peremptory challenges. (See *ante,* at p. 114 et seq.) The trial court denied the motion. We perceive no error. ■ To be sure, we have observed that "an erroneous denial of a challenge for cause can be cured by giving the defendant an additional peremptory challenge." (*People v. Bittaker, supra,* 48 Cal.3d 1046, 1088.) Yet, while a

---

[3] "The general rule confining the parties upon appeal to the theory advanced below is based on the rationale that the opposing party should not be required to defend for the first time on appeal against a new theory that 'contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial.' [Citation.]" (*Ward v. Taggart, supra,* 51 Cal.2d 736, 742.)

trial court that was convinced it had erred might well grant additional peremptory challenges, the mere *claim* of error cannot reasonably be thought sufficient to compel the court to do so. Otherwise, the number of peremptory challenges a trial court must allow would be limited only by the number of challenges for cause a party was willing to assert, regardless of merit. In another context, we have held that "to establish [a] constitutional entitlement to additional peremptory challenges . . . , a criminal defendant must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin* (1988) 46 Cal.3d 659, 679 [250 Cal.Rptr. 687, 758 P.2d 1217] [rejecting a claim of error based on the trial court's refusal to allow additional peremptory challenges to redress the effects of pretrial publicity].) We see no reason the same standard should not apply in this context. ██ Applying that standard, we conclude defendant cannot show the trial court's failure to allow additional peremptory challenges caused him to receive an unfair trial, because he did not challenge any sitting juror for cause.

Defendant also claims the trial court should have granted him additional peremptory challenges to redress what he describes as the court's error under *Wheeler, supra,* 22 Cal.3d 258, and *Batson, supra,* 476 U.S. 79. The claim lacks merit, because the court did not err. (See *ante,* at p. 115 et seq.) Defendant's unelaborated citations to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in support of this claim add nothing to his argument.

### 4. *Motion for Separate Guilt and Penalty Phase Juries*

Before trial, defendant asked the court to empanel separate juries for the guilt and penalty phases of his trial. The court exercised its discretion to deny the request. (See *People v. Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Defendant contends the court thereby abused its discretion and prejudiced the defense by forcing it to disclose information about his prior offenses in voir dire, thus biasing the jury against him at the guilt phase.

██ The claim lacks merit. Certainly a court has the power to empanel separate juries for the various phases of a capital case "for good cause shown." (§ 190.4, subd. (c).) Yet the Legislature has expressed a preference for a single jury (*ibid.*), and we have repeatedly held that defense counsel's desire to conduct voir dire one way for the guilt phase and another for the penalty phase does not constitute good cause for separate juries. (*People v. Rowland, supra,* 4 Cal.4th 238, 268; *People v. Nicolaus* (1991) 54 Cal.3d 551, 573–574 [286 Cal.Rptr. 628, 817 P.2d 893].) Contrary to defendant's assertion, California law does not force capital defendants to mention their

criminal history during voir dire. The decision whether to use voir dire to probe the prospective jurors' attitudes about other offenses that may be introduced at the penalty phase is just one of the difficult tactical decisions counsel routinely faces. (*People v. Nicolaus, supra,* at p. 573.)

Defendant distinguishes our prior decisions. (*People v. Rowland, supra,* 4 Cal.4th 238, 268; *People v. Nicolaus, supra,* 54 Cal.3d 551, 573–574.) In those decisions, he contends, "defense counsel chose to forgo complete voir dire rather than risk polluting the guilt phase jury with other crimes evidence." Here, defense counsel made the opposite decision. Thus, "for the first time," defendant continues, "this Court is in a position to assess the prejudice which flows from defense counsel's decision to conduct complete voir dire at the cost of polluting the guilt phase jury." The argument is not persuasive. ▆ The teaching of *People v. Nicolaus* is simply that the decision whether to use voir dire to probe prospective jurors' attitudes towards a defendant's other offenses is a tactical one entrusted to counsel's good judgment. Counsel's decision to use voir dire in this way does not transform into an abuse of discretion the court's proper order denying separate juries.[4]

Defendant also contends that the trial court, by refusing to empanel separate guilt and penalty phase juries, denied him due process and the right to a jury trial. (See U.S. Const., 5th, 6th, 8th & 14th Amends.) Defendant relies on *Leonard v. United States* (1964) 378 U.S. 544 [12 L.Ed.2d 1028, 84 S.Ct. 1696] (*per curiam*) and *Johnson v. Armontrout* (8th Cir. 1992) 961 F.2d 748. But those cases involved jurors who had been exposed to information about the defendants' criminality outside of the proceedings in which they were empanelled. In *Leonard v. United States,* the prospective jurors had been permitted to observe a trial in which the defendant was convicted of a related charge. The United States Supreme Court reversed the conviction in a brief opinion based on the Solicitor General's concession of error. (*Leonard v. United States, supra,* at p. 545.) In *Johnson v. Armontrout,* 10 of the prospective jurors and four of the trial jurors had recently rendered a verdict of guilt against the defendant's accomplice in another proceeding. The Eighth Circuit vacated the conviction because the petitioner on habeas corpus proved, among other things, that two jurors had harbored actual bias against him. (*Johnson v. Armontrout, supra,* at pp. 754, 756.) ▆ These decisions suggest no basis for reversing a verdict rendered by presumably

---

[4] Defendant does not claim that counsel's tactical decision to inform the prospective jurors of defendant's prior offenses deviated from the standard of care expected of criminal defense attorneys. To the contrary, he concedes that "[i]t was necessary to pose the question in order to ferret out attitudes which would have otherwise affected the penalty phase judgment." He also concedes that the exercise did succeed in producing information relevant to jury selection. According to defendant, the prospective jurors' answers to the question gave reason to exclude many, and "[n]o person served on the jury who expressed a prejudgment based on the defendant's prior record."

impartial jurors whose knowledge of the facts of the case derived solely from information properly presented in the proceeding in which they have been sworn.

### 5. *Admission of Evidence Concerning the Robbery of Geraldine Ford to Prove Identity and Intent*

Defendant contends the court erred in admitting evidence that he robbed and attempted to kidnap Geraldine Ford. We find no error.

The evidence relevant to this claim has already been summarized. (See *ante*, at p. 107 et seq.) Very briefly, defendant approached Ford in the parking lot of a department store, offering to change her car's flat tire. The repair completed, Ford thanked defendant and stood at the open door of her car. Defendant held a gun and a knife to her stomach and ordered her into his truck. Ford fled, and defendant took her purse from the driver's seat of her car. The People offered this evidence to show the intent and identity of Doris Horrell's killer. (Evid. Code, § 1101, subd. (b).) The defense moved to exclude the evidence as inadmissible character evidence (see *id.*, § 1101, subd. (a)) and also as posing a danger of unfair prejudice substantially outweighing any probative value (see *id.*, § 352). The court denied the motion.

Defendant's identity as Horrell's killer "was never seriously questioned," as defendant concedes. The defense did, however, earnestly challenge the People's theory that defendant formed the intent to rob Horrell before killing her. The People were required to prove that defendant harbored such an intent in order to establish the robbery-murder special circumstance. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263 [74 Cal.Rptr.2d 212, 954 P.2d 475]; § 190.2, subd. (a)(17)(A).) To rebut the People's theory was the purpose of the defense evidence that defendant was under the influence of methamphetamine when he killed Horrell, and of the defense cross-examination of Debra Stafford, who had testified on direct examination that defendant said he had stopped for Horrell "[b]ecause she was dressed nice and she looked like she might have some money."

Recognizing the importance of the issue to both sides, we nevertheless readily conclude the trial court properly exercised its discretion to admit defendant's conduct against Geraldine Ford in order to show his intent to rob Doris Horrell. Defendant contends the crimes against Ford bore insufficient common features to be probative of intent. ■ To be admissible to show intent, however, the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402

[27 Cal.Rptr.2d 646, 867 P.2d 757].) As the trial court here explained, defendant's use of a "good Samaritan ploy" to rob and attempt to kidnap Ford, a stranded female motorist, was sufficiently similar to his later conduct against Horrell to support the inference that he probably harbored a similar intent to rob Horrell when he stopped for her on the freeway. The probative value of defendant's prior conduct against Ford was, moreover, sufficient to outweigh any risk of unfair prejudice. (See Evid. Code, § 352.)

Challenging these conclusions, defendant argues that his conduct against Ford shows only an intent to kidnap, not to rob. Although he took Ford's purse, defendant argues, he must have taken it from the driver's seat of her car after she fled and, thus, not from her immediate presence or while she still was under force or fear, as required for robbery. His conduct and words before Ford fled, defendant continues, show nothing more than an effort to force her into his truck, leaving the purse on the front seat of her car. Assuming for the sake of argument that defendant's interpretation of the evidence is plausible, at least equally plausible is the alternative inference that an assailant holding a gun and a knife to his victim's stomach may intend to control her while simultaneously reaching a few feet for valuable property. Ford testified that the purse was within reach as she stood at the car's open door. Certainly the inference that one of defendant's reasons for approaching Ford was to take her property by force or fear was strong enough to support the court's discretionary decision to permit the jury to consider the evidence.

The trial court also admitted the evidence of defendant's attack on Ford to show the identity of Doris Horrell's killer. ██ To be admissible to show identity, the prior conduct and the charged offense must share common features that are sufficiently distinctive to support the inference that the same person committed both acts. (*People v. Ewoldt, supra,* 7 Cal.4th 380, 403.) The degree of similarity required to show identity is thus higher than that required to show intent. (*Id.,* at pp. 402–403.) Here, the People argued that sufficient common features resided in the evidence already mentioned (i.e., defendant's use of a good Samaritan ploy to attempt to kidnap female motorists with car trouble), together with the additional evidence that defendant, on both occasions, used the same truck and gave to female friends items of jewelry taken from the victims. We need not decide whether these common features sufficed to show identity. ██ The court's ruling admitting the evidence for that purpose, even if erroneous, could not have prejudiced defendant because the same evidence was properly admitted to show intent and because defendant concedes that his identity as Horrell's killer "was never seriously questioned."

Turning to federal law, defendant contends that the trial court's decision to admit his prior bad acts against Ford was arbitrary and fundamentally unfair,

and thus violated due process. (See *Terranova v. Kincheloe* (9th Cir. 1988) 852 F.2d 424, 428–429.)[5] Defendant advanced essentially the same claim at trial, where he argued that to admit the Ford incident would violate due process because it would permit the jury to find him guilty on insufficient evidence, and that any such error would affect the reliability of the penalty phase verdict. In support of his position defendant repeats his previous citations to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and adds an unelaborated citation to the Fifth Amendment. We reject the argument because the trial court's decision to admit the evidence was correct under state law (Evid. Code, §§ 352, 1101, subd. (b); see *People v. Ewoldt, supra,* 7 Cal.4th 380, 402–403), was neither arbitrary nor fundamentally unfair, and did not render the death verdict unreliable.

### 6. *Claims Based on Geraldine Ford's Identification of Defendant*

#### a. *Suggestive lineup*

Defendant asserts that a suggestive photographic lineup tainted Geraldine Ford's identification of him as her assailant. On this basis, he claims the trial court erred in denying his motion in limine to exclude Ford's out-of-court identification and in permitting her to identify him in court. We perceive no error. Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 106–114 [53 L.Ed.2d 140, 97 S.Ct. 2243]; *Neil v. Biggers* (1972) 409 U.S. 188, 196–199 [34 L.Ed.2d 401, 93 S.Ct. 375]; see *People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Defendant has not shown that the identification procedures used in this case were unnecessarily suggestive.

The following summary of the facts is drawn from the evidence presented at the hearing on defendant's motion in limine to exclude Ford's identification testimony. On January 4, 1988, the day Ford was robbed, she observed defendant for 10 to 15 minutes while he changed her car's flat tire and then confronted her with weapons. It was just starting to get dark, and the lights in the parking lot were on. Detective Craig Trimble met with Ford the next day, January 5, to review her prior statement to the responding officer. At that time, Ford helped to make a composite sketch of her assailant and mentioned that his left hand bore a flower tattoo.

---

[5] Of tangential relevance only are the other authorities defendant cites. (*In re Winship* (1970) 397 U.S. 358, 362–364 [25 L.Ed.2d 368, 90 S.Ct. 1068] [due process requires proof beyond a reasonable doubt of criminal charges]; *Brinegar v. United States* (1949) 338 U.S. 160, 174 [93 L.Ed. 1879, 69 S.Ct. 1302] [same]; *People v. Alcala* (1984) 36 Cal.3d 604, 630–636 [205 Cal.Rptr. 775, 685 P.2d 1126] [reversing a criminal conviction because admission of other-crimes evidence was prejudicial under the circumstances of the case].)

On January 8, Trimble showed Ford about 150 photographs in mug shot books. She did not, however, identify any possible suspects. On February 3, Ford called Trimble to say she had seen in the newspaper a photograph of a person who was wanted by the Sacramento Police and who, she thought, might be the person who had attacked her. The photograph was of Lowell Mugridge, also known as Dan Bennett. On February 17, Trimble showed Ford a lineup of five color photographs. The fourth photograph was of defendant and was at least a year, or a year and a half, old. Ford did not identify anyone as a suspect. In preparing the lineup, Trimble did not include a photograph of Mugridge because Ford had already seen his picture in a mug book on January 8 but had not identified him. On March 18, Trimble showed Ford a second lineup of five color photographs. This lineup included, again in the fourth position, a different, more recent photograph of defendant taken after his arrest for the murder of Doris Horrell on February 16. After viewing this lineup, Ford identified defendant as her assailant. In selecting the fourth image, Ford told Trimble, "[t]his person here looks just like him except for the way his hair is combed. His facial features are the same and color of the hair is the same." Trimble did not tell Ford she had selected the right person. Trimble also showed Ford a photograph of the back of defendant's hands, but Ford was unable positively to identify the flower tattoo in the photograph as the one she had seen. Trimble did not tell Ford that the hands in the photograph belonged to the same person she had selected in the lineup. Before each lineup, Trimble admonished Ford that the suspect's photograph might or might not be included and that she should not feel obligated to choose one. Trimble never suggested or intimated by word or gesture that Ford should pick a particular photograph.

We perceive nothing unduly suggestive in the identification procedures just described. To determine whether a procedure is unduly suggestive, we ask "whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708], quoting *People v. Johnson* (1992) 3 Cal.4th 1183, 1217 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Defendant emphasizes that his image appeared in both lineups, each time in the fourth position. To use a suspect's image in successive lineups might be suggestive if the same photograph were reused or if the lineups followed each other quickly enough for the witness to retain a distinct memory of the prior lineup. But here, different photographs of defendant appeared in each lineup, and the two lineups were separated in time by a month. Under these circumstances we see no reason to believe that the use or position of defendant's image in both lineups was unnecessarily suggestive. [6] Defendant

---

[6] We have inspected the two lineups, which were admitted as defendant's exhibits M-19-A and M-19-B-1 through 5. Each lineup consists of five identically sized photographs of Caucasian males of apparently similar age and with similar facial features. Four of the men

seems to argue that any further attempt to elicit a positive identification of a particular suspect from an eyewitness who does not identify the suspect from the first photograph shown must be considered unduly suggestive. But no such rule exists. Defendant also argues that the lineups in this case were unnecessarily suggestive because Detective Trimble did not include in them a photograph of Mugridge, whom Ford had named as a possible suspect. But this omission has no apparent significance, since no evidence suggests, and defendant has never claimed, that Mugridge actually committed the crime against Ford.

Our determination that the identification procedures used here were not unnecessarily suggestive disposes of defendant's claim under due process. Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification. (*People v. Johnson, supra*, 3 Cal.4th 1183, 1216; *People v. Gordon, supra*, 50 Cal.3d 1223, 1242.)

Defendant also contends that Ford's identification of him was tainted by her attendance, in September 1988, at a portion of his preliminary hearing for the murder of Doris Horrell. As the trial court below expressly found, however, Ford's attendance at the September hearing has no conceivable bearing on the accuracy of her identification of defendant in the March lineup, six months earlier, or on the dispositive question of whether the lineups were unduly suggestive. Ford's attendance at the September hearing might conceivably have affected her identification of defendant in court. But testimony at defendant's motion in limine revealed that Ford had not been called as a witness at the preliminary hearing, had attended on her own volition and not at the direction of the People, and had seen defendant's back only. Ford's unilateral decision to attend does not implicate the rule of *Manson v. Brathwaite, supra*, 432 U.S. 98, and *Neil v. Biggers, supra*, 409 U.S. 188, which speaks only to suggestive identification procedures employed by the People. Thus, Ford's attendance at the hearing affects only the weight, rather than the admissibility, of her testimony. Because the court properly permitted the defense to cross-examine her on this matter before the jury, we see no plausible claim of error.

depicted in the original color photographs that comprise exhibits M-19-B-1 through 5 (the March 18 lineup) appear to have similarly colored light red hair. One man has grey hair. Hair color is not evident in exhibit M-19-A, which is a black-and-white photocopy of the February 17 lineup. The color photographs show their subjects against identical blue backgrounds.

During the motion in limine to exclude Ford's identification testimony, the trial court stated that the different photographs of defendant used in the two lineups appeared to show "two different human beings." In fact, the two photographs are significantly different. In the February 17 lineup, defendant is wearing different clothes than in the March 18 lineup, has a different facial expression, and appears to be looking down at the camera.

### b. Sanction for loss of original photographs

The People lost the original color photographs that formed the lineup of February 17; only a black-and-white photocopy was available for trial. As a sanction for the original photographs' loss, defendant asked the trial court to exclude Ford's identification testimony. Defendant later changed his request to one for an instruction that the missing original photograph from the first lineup, which Ford did not identify, showed a likeness of defendant that was "as good or better" than the photograph Ford subsequently identified on March 18. The trial court rejected all of these proposed sanctions as unduly severe because no evidence suggested the loss was intentional or showed bad faith, because the People had conducted a search for the originals, and because a photocopy was available. The trial court did, however, instruct the jury that the People would not be permitted to suggest that Ford had failed to identify defendant from the lost photograph because it was a poor likeness, and that it would be unfair for the jury to draw any such conclusion.

In these rulings we find no error. "[C]ourts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence. '[N]ot every suppression of evidence requires dismissal of charges. . . . The remedies to be applied need be only those required to assure the defendant a fair trial.' " (*People v. Zamora* (1980) 28 Cal.3d 88, 99 [167 Cal.Rptr. 573, 615 P.2d 1361].) Despite the loss of the original photographs, the defense successfully proved with the photocopy and through the testimony of Detective Trimble that Ford had failed to identify defendant on February 17. The court's remedial rulings barred the People from attempting to rebut the defense evidence by arguing that the original photograph was not a good likeness of defendant. On this record, we see no reason to doubt that defendant received a fair trial.

Assuming for the sake of argument that the sanction actually imposed was insufficient, the hypothetical error could not have caused prejudice. This is true even if, as defendant argues, we must evaluate prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], based on the assumption that the People's loss of the original photographs implicated defendant's due process rights. (See U.S. Const., 14th Amend.) In support of this argument, defendant cites *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333] and *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], both of which recognize the People's obligation to preserve potentially exculpatory evidence.

The evidence identifying defendant as Ford's attacker, even disregarding Ford's identification testimony, easily justifies the conclusion that the trial

court's failure to impose the harsher sanctions proposed by the defense was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18, 24.) Patricia Weers, to whom defendant gave Ford's distinctive diamond and pearl ring, testified that defendant said he had gotten the ring from a woman who worked for the California Highway Patrol and he wanted it back "because it could incriminate him in a crime." Police eventually recovered the ring from Debbie Yoast, who had bought it from Weers. Ford's telephone bill showed calls to defendant's friend Ron Kegg, made on a Sprint card Ford had never used. When Detective Trimble told defendant he "was investigating a robbery that occurred at the Target Store on Madison Avenue on or about January 4" and "had a lead concerning the use of the victim's Sprint card," defendant replied, "You are on the right track." Finally, Ford identified a photograph of defendant's camper as the one on her assailant's pickup truck. In view of this evidence, which left no serious doubt that defendant was Ford's assailant, the trial court's failure to impose the harsher sanctions proposed by the defense was harmless beyond a reasonable doubt.

### 7. *Sufficiency of the Evidence*

Defendant claims the People did not introduce sufficient evidence to prove the robbery-murder special circumstance. (§ 190.2, subd. (a)(17)(A).) The claim lacks merit.

 In order to prove the special circumstance, the People had to prove that defendant formed the intent to steal before or while killing Doris Horrell. (*People v. Sakarias* (2000) 22 Cal.4th 596, 618–619 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Green* (1980) 27 Cal.3d 1, 52–53 [164 Cal.Rptr. 1, 609 P.2d 468].) The relevant evidence showed that defendant left Ron Kegg's apartment shortly before the killing, telling Debra Stafford that he had to get some money. Defendant then stopped on the highway for Horrell, a well-dressed, stranded motorist, taking her purse, jewelry, coat, house keys and bank cards before abandoning her body. Shortly thereafter, defendant explained to Stafford that he had stopped for Horrell "[b]ecause she was dressed nice and looked like she might have some money."

This evidence sufficed. When "one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].) Here, defendant took valuable property from the victim and had no other apparent reason for killing her. The defense attempted to supply another reason with Dr. Rosenthal's opinion testimony that the killing was an irrational act caused by defendant's use of methamphetamine. But the jury was not required to accept the witness's opinion. In any event, the defense theory that defendant killed irrationally and only later

decided to steal was contradicted by the evidence that he intentionally selected a vulnerable, well-dressed victim, took valuable property and immediately afterwards destroyed evidence linking himself to the crime. The testimony that defendant had recently committed a similar crime against another stranded motorist (Ford) provided additional circumstantial evidence that his purpose in stopping for Horrell was to steal.

■ Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt. (*People v. Millwee* (1998) 18 Cal.4th 96, 132 [74 Cal.Rptr.2d 418, 954 P.2d 990].) When our examination of the whole record discloses evidence that is sufficiently reasonable, credible and of such solid value as to permit a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt, we must affirm. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The record in this case does disclose sufficient evidence, as we have explained.

The same conclusion disposes of defendant's claim under the due process clause of the United States Constitution, which bars criminal convictions except on proof sufficient to establish guilt beyond a reasonable doubt. (*In re Winship, supra*, 397 U.S. 358, 362–364; see U.S. Const., 14th Amend.) Defendant also cites the Fifth, Sixth and Eighth Amendments in support of this claim, but he does not explain how any of those provisions might support a conclusion different from the one we now reach.

8. *Failure to Instruct on Theft*

Defendant contends the trial court erred in declining his request for an instruction on theft from a dead human body (§ 642) and in failing to instruct the jury sua sponte on theft (§ 484), a lesser included offense of robbery. The former ruling does not support a claim of error. Assuming for the sake of argument the latter does, we find no possibility of prejudice.

At the conclusion of the guilt phase, the trial court instructed the jury on robbery (§ 211), murder (§ 187), the robbery-murder special circumstance (190.2, subd. (a)(17)(A)), various lesser included offenses of murder, and other matters not relevant to this discussion. The court declined to instruct on theft from ·a dead human body, explaining that nothing "in the evidence . . . suggests less than robbery." The court did, however, instruct the jury that "[r]obbery requires proof of an intent to steal before or during the application of force, rather than merely after the application of force. Further, there is no robbery if the intent to steal arises only after the possessor of the property is

dead; that is, the intent to steal did not arise before or during the act of killing." Applying these instructions, the jury convicted defendant of robbery and murder, and found the robbery-murder special circumstance true.

The trial court's failure to instruct on theft from a dead human body (§ 642) does not support a claim of error. That offense is not included within robbery, and a defendant has no unilateral right to an instruction on an uncharged offense that is not necessarily included within a charged offense. (*People v. Birks* (1998) 19 Cal.4th 108, 136 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) While theft from a dead human body might have been sufficiently related to robbery to have permitted an instruction under the reasoning of *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303], we retroactively overruled *Geiger* in *People v. Birks*, *supra*, at page 113.

Theft (§ 484), on the other hand, is a lesser offense necessarily included within robbery. (*People v. Ortega* (1998) 19 Cal.4th 686, 693–694 [80 Cal.Rptr.2d 489, 968 P.2d 48] ; *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Defendant did not, however, specifically request an instruction on theft, as distinguished from theft from a dead human body. A duty to instruct sua sponte on a lesser included offense arises only when evidence exists that would justify a conviction on the lesser offense. (*People v. Bradford*, *supra*, at p. 1055.) In defendant's view, the record does contain evidence showing he first formed the intent to take property from Doris Horrell only after she had died and, thus, was guilty only of theft rather than robbery. Defendant would find such evidence primarily in the testimony of defense expert Dr. Rosenthal, who testified that defendant probably killed Horrell under the influence of methamphetamine and that advanced levels of methamphetamine intoxication can render a user unable to formulate so complex a plan as to pose as a good Samaritan for the purpose of killing a stranded motorist and taking her valuables.

Assuming for the sake of argument this evidence sufficed to require an instruction on theft, the trial court's failure to give such an instruction could not have caused prejudice. This is because the court instructed the jury that "[r]obbery requires proof of an intent to steal before or during the application of force, rather than merely after the application of force. Further, there is no robbery if the intent to steal arises only after the possessor of the property is dead; that is, the intent to steal did not arise before or during the act of killing." By finding defendant guilty of robbery despite this instruction, the jury must have resolved against him the question whether he formed the intent to steal only after Horrell died. Therefore, any hypothetical error was harmless. (See *People v. Turner*, *supra*, 50 Cal.3d 668, 690–691; see also *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Even though the jury must have resolved the question of intent against him under the proper instruction just quoted, defendant contends the trial court nevertheless erred under *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]. The decision in *Beck* has nothing to do with this case. In *Beck*, the United States Supreme Court held that an Alabama law barring instructions on lesser included offenses of capital murder violated the Eighth and Fourteenth Amendments to the United States Constitution. (*Beck, supra,* at pp. 627, 637–638.) California law is not similar. Moreover, the trial court below did instruct on several lesser included offenses of capital murder, including second degree murder, voluntary manslaughter and involuntary manslaughter. Because the jury thus "was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence," the "central concern of *Beck* simply is not implicated." (*Schad v. Arizona* (1991) 501 U.S. 624, 647 [115 L.Ed.2d 555, 111 S.Ct. 2491]; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 953–954 [42 Cal.Rptr.2d 636, 897 P.2d 574].) In any event, the high court in *Beck* did not purport to require instructions on lesser included offenses of crimes other than capital murder. (See *Beck, supra,* at p. 637.)

### 9. Instructions on Suppression of Evidence and Conscious Possession of Recently Stolen Property

The trial court instructed the jury in the language of CALJIC No. 2.06 that an attempt by defendant to suppress evidence tended to show consciousness of guilt but was, by itself, insufficient to prove guilt.[7] The court also instructed, in language based on CALJIC No. 2.15, that conscious possession of recently stolen property did not by itself permit the inference that defendant was guilty of robbery, but did permit such an inference if corroborating evidence existed.[8] Defendant objected to both instructions.

---

[7] The court instructed: "If you find the defendant attempted to suppress evidence against himself in any manner such as by destroying evidence or concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. In other words, circumstantial evidence. [¶] However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

[8] The court instructed: "If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant, in this case, Mr. Yeoman, is guilty of the robbery of that recently stolen property. [¶] Before guilt of that offense, of robbery may be inferred, there must be corroborating evidence tending to prove the defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt of the robbery. [¶] As corroboration, you may consider the attributes of the possession, the time, place, manner of the possession, whether or not the defendant had an opportunity to commit the crime charged, the defendant's conduct, or any other evidence which tends to connect the defendant with the crimes charged."

Defendant does not contend that these instructions lacked a sufficient evidentiary basis. He does, however, argue they violated *People v. Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049], in which we disapproved argumentative instructions that imply certain conclusions from specified evidence. We rejected the same claim as to CALJIC No. 2.06 in *People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254], and see no reason to reconsider the point. We have not previously considered the claim that CALJIC No. 2.15 violates *People v. Wright, supra*, 45 Cal.3d 1126. Considering the claim now, we find that the instruction has a proper purpose rather than the argumentative purpose condemned in *Wright*. Among other things, CALJIC No. 2.15 informs the jury that conscious possession of recently stolen property is insufficient, without corroboration, to sustain a conviction. "If the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. Nothing in *Wright* affects such an instruction." (*People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Defendant also contends that CALJIC Nos. 2.06 and 2.15 violate due process because they create mandatory inferences or conclusive presumptions that shift, in effect, the People's burden of proof to the defense. (See generally *Sandstrom v. Montana* (1979) 442 U.S. 510, 521–524 [61 L.Ed.2d 39, 99 S.Ct. 2450].) We have previously rejected the contention because the instructions in question permit, but clearly do not require, the jury to draw the inferences described therein. (See *People v. Jackson, supra*, 13 Cal.4th 1164, 1223–1224 [upholding CALJIC No. 2.03]; see also *People v. Holt* (1997) 15 Cal.4th 619, 676–677 [63 Cal.Rptr.2d 782, 937 P.2d 213] [upholding CALJIC No. 2.15]; *People v. Johnson* (1993) 6 Cal.4th 1, 37 [23 Cal.Rptr.2d 593, 859 P.2d 673] [same].)

Defendant also claims that CALJIC Nos. 2.06 and 2.15 violate due process even if seen as creating permissive inferences. But "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315 [85 L.Ed.2d 344, 105 S.Ct. 1965]; see *Ulster County v. Allen* (1979) 442 U.S. 140, 157–163 [60 L.Ed.2d 777, 99 S.Ct. 2213].) Here, reason and common sense amply justified the suggested conclusion that defendant's suppression of evidence showed consciousness of guilt. (See CALJIC No. 2.06.) Among other things, defendant's expressed desire to remove his fingerprints from Horrell's car immediately followed his admission to Stafford that he had murdered its driver. Reason and common sense also justified the conclusion that defendant's conscious possession of Horrell's recently stolen property tended to show he was guilty of robbery (see CALJIC No. 2.15), in view of the

corroborating evidence, which included most notably the admission that he had stopped for the stranded motorist because she was well dressed and seemed likely to have money.

## B. *Penalty Phase Issues*

### 1. *Failure to Conduct Foundational Hearing Before Admitting Evidence of the Killing of David Hill*

The People at the penalty phase presented evidence that defendant had killed David Hill. (See *ante*, at p. 110 et seq.) The evidence was relevant to prove an aggravating circumstance, namely, the presence of criminal activity by defendant involving the use of force or violence. (§ 190.3, factor (b).) Defendant contends the court abused its discretion by admitting the evidence without first holding a foundational hearing under Evidence Code section 402 to determine whether the evidence was sufficient to prove defendant guilty of the offense beyond a reasonable doubt. For the reasons set out below, we find no abuse of discretion.

To admit evidence of unadjudicated crimes under section 190.3, factor (b) necessarily entails a risk that the evidence may not be sufficient to convince all jurors of the defendant's guilt. Yet we have described this risk as acceptable, in view of the need to place before the jury all evidence properly bearing on its capital sentencing decision, and in view of the rule that no juror may consider such evidence unless first convinced of its truth beyond a reasonable doubt. (*People v. Caro* (1988) 46 Cal.3d 1035, 1057 [251 Cal. Rptr. 757, 761 P.2d 680].) The court must give such an instruction sua sponte whenever it admits evidence under factor (b). (*People v. Michaels* (2002) 28 Cal.4th 486, 539 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Robertson* (1982) 33 Cal.3d 21, 53–55 [188 Cal.Rptr. 77, 655 P.2d 279].) Foundational hearings, which can also help to mitigate the risk, "may be advisable" (*People v. Fauber* (1992) 2 Cal.4th 792, 849 [9 Cal.Rptr.2d 24, 831 P.2d 249]; see *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]) but are not required. The matter lies entirely within the court's discretion. (*People v. Fauber, supra*, at p. 849.)

In this case, defendant has failed to show either an abuse of discretion or any possibility of prejudice. The evidence that defendant murdered Hill, which we have already summarized (see *ante*, at p. 110 et seq.), was sufficient to prove his guilt beyond a reasonable doubt. The court had no reason to believe otherwise at the time it declined to hold a foundational hearing. Defendant's various theories of third party culpability did not compel the jurors to reject the prosecution's evidence. In any event, any hypothetical

juror whom the prosecution's evidence might not have convinced beyond a reasonable doubt must be presumed to have followed the court's instruction to disregard the evidence.

Defendant argues that California law denies him equal protection (U.S. Const., 14th Amend.) by requiring preliminary hearings for charged offenses but not for uncharged criminal acts admitted under section 190.3, factor (b). ▮ But equal protection does not require the procedures for proving uncharged crimes admitted under factor (b) to be as stringent as the procedures for proving charged offenses. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 136 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Medina* (1990) 51 Cal.3d 870, 906–907 [274 Cal.Rptr. 849, 799 P.2d 1282]; cf. *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 [222 Cal.Rptr. 184, 711 P.2d 480] [rejecting a similar claim under the due process clause].) The differing treatment is justified by the need to allow the "jury to weigh and consider the defendant's prior criminal conduct in determining penalty, so long as reasonable steps are taken to assure the defendant a fair and impartial penalty trial." (*People v. Medina, supra,* at p. 907.)

Restating this claim under the Eighth Amendment to the United States Constitution, defendant argues that to admit evidence of the Hill killing under section 190.3, factor (b), without first testing the strength of the evidence in a foundational hearing, rendered the death sentence arbitrary and unreliable.[9] The People contend defendant waived the claim because he referred in the trial court only to the due process and equal protection clauses of the federal and state Constitutions. Defendant's new claim, however, merely invites us to draw an alternative legal conclusion (i.e., that the death sentence is arbitrary and unreliable) from the same information he presented to the trial court (i.e., that the evidence showing he killed Hill was untested and, thus, could not be presented to the jury without causing unfair prejudice). We may therefore properly consider the claim on appeal. (See *ante,* at p. 117 et seq.)

Considering the Eighth Amendment claim, we find it lacks merit. Defendant argues that "[w]ithout a reasonable guarantee of certainty that the [Hill killing] was committed by the defendant, there is no means to conclude that the death penalty has been fairly imposed." We have, however, already concluded that the evidence defendant killed Hill was sufficient to prove his guilt beyond a reasonable doubt. The United States Supreme Court has upheld section 190.3, factor (b), which authorizes the admission of uncharged offenses, against an Eighth Amendment challenge because the factor "is phrased in conventional and understandable terms and rests in large part on a determination whether certain events occurred, thus asking the jury to

---

[9] Defendant also cites the Fifth and Sixth Amendments without, however, articulating intelligible claims under those provisions.

consider matters of historical fact." (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630].) The requirement that each juror be convinced by such evidence beyond a reasonable doubt before considering it enhances the reliability of the sentence. (*People v. Michaels, supra*, 28 Cal.4th 486, 539; *People v. Robertson, supra*, 33 Cal.3d 21, 53–55.)

### 2. *Admission of Threats to Kill and Denial of a Continuance*

The People proved that defendant had committed various sexual acts upon his stepdaughter, Sharon C., when she was between 10 and 13 years old, and that Sharon had submitted to defendant because she feared him. (See *ante*, at p. 109 et seq.) The court permitted the jury to consider this evidence under section 190.3, factor (b), as criminal activity involving a threat of violence. The court also permitted the jury to consider under section 190.3, factor (c), as a prior felony conviction, defendant's 1977 guilty plea to a charge of lewd and lascivious conduct (§ 288, subd. (a)) arising out of the same conduct. On appeal, defendant claims the People did not give adequate notice of their intent to introduce the violent circumstances of the molestation under factor (b), that the prosecutor affirmatively misled the defense on this point, and that the court abused its discretion in denying a continuance to investigate the evidence. These claims lack merit.

The People must give notice of the aggravating evidence they plan to offer "within a reasonable period of time as determined by the court, prior to trial." (§ 190.3.) ▇▇ The law permits the People to introduce, under section 190.3, factor (b), the violent circumstances of a prior felony conviction introduced under section 190.3, factor (c), even though the least adjudicated elements of the prior conviction do not include violence. (*People v. McDowell* (1988) 46 Cal.3d 551, 566–568 [250 Cal.Rptr. 530, 758 P.2d 1060, 763 P.2d 1269].) In this case, the People expressly declared in their timely pretrial notice of aggravating evidence the intention to prove, among other things, "[t]he felony convictions of Ralph Michael Yeoman for robbery with great bodily injury, oral copulation with a child under 14 years, and child molestation . . . *and the circumstances underlying those convictions*. Penal Code sections 190.3(b) and (c)." (Italics added.) Neither violence nor the threat of violence is an element of lewd and lascivious conduct. (§ 288, subd. (a).) Yet the defense still had reason to believe the People would seek to admit the circumstances of that crime under factor (b), because the notice had said precisely that and because the People had disclosed in pretrial discovery the police reports on the molestation, which mentioned Sharon's statement that she feared defendant because he had beaten her mother, Wilma. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1359 [65 Cal.Rptr.2d 145, 939 P.2d 259] [police reports can provide actual notice of aggravating evidence].) Taken as a whole, this information was adequate to place defendant on notice and to give him a fair opportunity to investigate the relevant facts.

Also without merit are defendant's additional claims that the prosecutor misled the defense and that the trial court abused its discretion by refusing to grant a continuance. Before the penalty phase opening statements commenced, the People requested a hearing under Evidence Code section 402 to clarify whether the court would admit the circumstances of the molestation under Penal Code section 190.3, factor (b). At the same time, the prosecutor stated that Sharon in a recent interview had revealed additional facts previously unknown to the People. Based on the interview, the prosecutor believed that Sharon "would say that from the time she was about ten to twelve she submitted to these acts because she just thought there was nothing wrong with it. [¶] At about the time, two years into this program of the sexual acts being done on her, she, on her own, figured out it was wrong and confronted the defendant about it. And at that time, he threatened to kill her if she told on him, and from there on she submitted to him because she was afraid of what he would do to her." The prosecutor made these statements in court on Tuesday, March 20, 1990. The last preceding court day had been Tuesday, March 13. The prosecutor had interviewed Sharon on Thursday, March 15 and disclosed her new statements to the defense on Monday, March 19, the day before the trial resumed.

On Wednesday, March 21, 1990, the next day of trial, the court conducted a foundational hearing on Sharon's testimony outside the jury's presence. Consistently with the prosecutor's representation, Sharon testified that when she confronted defendant about his sexual conduct towards her, he told her the family would be split up if she revealed what had happened, that this would be her fault, and that he would kill her. After hearing this, Sharon submitted to further sexual acts because she "couldn't run away, other than on the streets," and because she "was scared to death of him." On cross-examination, still outside the jury's presence, Sharon acknowledged she had not told the police officers who investigated the molestations that defendant had threatened her. Sharon had not mentioned the threats because the officers had told her that defendant "would be out of the home" and because she was not, at that time, "thinking of the death threat. [She] was thinking of a way out, whether it was suicide or what else."

Based on this testimony, the court correctly ruled that the circumstances of the 1977 conviction for lewd and lascivious conduct were admissible under factor (b) because they entailed a "threat to use force or violence." (§ 190.3, factor (b).) Sharon's ensuing testimony before the jury was consistent with her foundational testimony, except that, when asked by the prosecutor why she feared defendant, she added the new fact that defendant had actually beaten her. "I was scared for my life as well as my mother and brother and sisters," Sharon testified. "He told me if I ever told anybody he would kill me. Numerous times I saw him beat my mother, beat me."

Defendant claims the prosecutor misled the defense concerning the nature of Sharon's testimony. The record, however, gives no reason to believe that the prosecutor, at any time, obtained more detailed knowledge of Sharon's possible testimony than he promptly thereafter revealed to the defense. Nor did the court err in denying a continuance to permit the defense to investigate. Both Sharon and her mother had been designated as witnesses before trial. Moreover, the police reports gave the defense notice that Sharon claimed to fear defendant because she had seen him beat her mother. (See *People v. Bradford, supra*, 15 Cal.4th 1229, 1359.) Finally, in denying defendant's request for a continuance, the court expressly offered to reconsider the matter should the defense show that it was unable to find a witness it was actually attempting to find. The defense never offered to make such a showing. Under these circumstances, we see no basis for concluding the trial court abused its discretion.

Citing the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, defendant contends the People's failure to give notice of Sharon's testimony, and the court's refusal to grant a continuance, denied him the rights to due process, a fair trial, reasonable notice of the charges against him, the effective assistance of counsel and a death judgment based on reliable evidence. These claims fail because their factual predicate is false: Contrary to defendant's assertion, the People gave adequate notice of their intent to introduce the violent circumstances of the molestations under section 190.3, factor (b).

### 3. *Admission of Evidence of Rape*

The People introduced evidence that defendant, while in the United States Army, had forcibly raped Linda E., the wife of a friend and fellow soldier. (See *ante*, at p. 109 et seq.) The court allowed the jury to consider the evidence under section 190.3, factor (b), as showing prior violent criminal activity. Defendant contends the admission of this evidence, which he describes as stale, violated his rights to due process, a speedy trial and a reliable determination of penalty. Defendant characterizes the claim as arising under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Defendant unsuccessfully raised the same claim at trial.

The claim lacks merit. In *People v. Rodrigues* (1994) 8 Cal.4th 1060 [36 Cal.Rptr.2d 235, 885 P.2d 1], we concluded that the admission of violent criminal conduct occurring many years before the penalty trial is not necessarily inconsistent with a defendant's rights to due process, a speedy trial and a reliable penalty determination. We reasoned that "the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as

reasonable steps are taken to assure a fair and impartial penalty trial." (*Id.*, at p. 1161.) We identified those "reasonable steps" as including notice of the evidence to be introduced, the opportunity to confront the available witnesses, and the requirement of proof beyond a reasonable doubt. When these steps have been taken, we concluded, the remoteness of the offense affects its weight, not its admissibility. (*Ibid.*)

Defendant argues for a different result in this case because certain witnesses who might have been able to offer testimony about the 1968 rape were not available. The record, however, does not make clear that such a claim was adequately preserved. In his written motion to exclude evidence of the rape, defendant identified several witnesses who testified at the court-martial, or who might have been called to testify had defendant not terminated that proceeding by changing his plea to guilty. Arguing the motion later in court, however, the defense identified only three assertedly unavailable witnesses whose prior testimony they wished to offer: Sergeant Theopia James, who had investigated the rape, Delbert Marshall, whom the defense did not further identify, and Sergeant Fitzgerald, who had released defendant from duty on the day of the rape. The court ruled that Sergeant Fitzgerald was unavailable but did not rule on the other two proposed witnesses. Nevertheless, defense counsel immediately thereafter stated that, "[b]asically, all we are introducing is Sergeant Fitzgerald," and never again mentioned the other witnesses or offered their prior testimony into evidence. The defense had already cross-examined Linda and, in so doing, attempted to raise the inference that she had consented to sex and fabricated the rape in order to secure her husband's return from Vietnam on a claim of hardship. The reading of Sergeant Fitzgerald's prior testimony provided a factual basis for the questions about consent that the defense had posed to Linda on cross-examination.

On this record, we see no reason to believe that the age of the rape charge, the unavailability of witnesses or the trial court's rulings deprived defendant of a fair opportunity to present a defense. The fair opportunity defendant did enjoy, and the court's instruction to the jury not to consider the rape unless convinced of defendant's guilt beyond a reasonable doubt, satisfied constitutional requirements. (See *People v. Rodriguez, supra*, 8 Cal.4th 1060, 1161.) Defendant cites *Johnson v. Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] as holding that the procedures for considering aggravating evidence of other crimes must conform in all respects to the constitutional standards governing proof of charged offenses. But *Johnson* does not so hold. In that decision, the high court reversed a death judgment because the prosecution had been allowed to prove a prior conviction with nothing more than the record of a judgment that had been reversed on appeal; "the prosecutor did not introduce any evidence concerning the alleged assault itself . . . ." (*Johnson v. Mississippi, supra*, at p. 585.) Here, in contrast, the People did not seek to prove a prior conviction for rape. Instead, they merely

proved other violent criminal conduct by defendant (§ 190.3, factor (b)) through properly admitted evidence. About this, *Johnson* has nothing to say.

### 4. *Admission of Defendant's Court-martial Guilty Plea*

The trial court permitted the People to introduce, as part of their proof that defendant had raped Linda E., defendant's admission and plea of guilty to that crime in a court-martial. The court instructed the jury to consider the plea as an admission of prior violent criminal conduct under section 190.3, factor (b), but not as a prior conviction under section 190.3, factor (c). Defendant contends that the use of his plea for this purpose violated his rights to due process and to a reliable sentencing determination. Defendant describes the claim as arising under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The claim lacks merit.

Defendant's argument rests upon the following three propositions: First, convictions rendered in courts-martial are not admissible as prior convictions under section 190.3, factor (c) because the procedural rights of defendants in military proceedings differ from those of defendants in civilian proceedings. Second, although the jurors were told not to consider the plea as evidence of a prior conviction, they probably did not grasp the fine distinction between evidence of a prior conviction and evidence of guilt; thus, the jury could only have viewed the plea as a prior conviction. Third, the prosecutor exacerbated the problem by stressing in closing argument the evidentiary weight of defendant's admission and guilty plea.

We need not consider defendant's first proposition, i.e., that guilty pleas offered in courts-martial are not admissible as evidence of prior convictions. The People did not offer the plea as evidence of a prior conviction, and the jurors were informed by stipulation not to consider the plea for that purpose. [10] Defendant's second proposition—that the jurors probably did not

---

[10] The following stipulation was read to the jury:

"After August 3rd 1968, the United States Army charged the defendant Ralph Michael Yeoman with the crime of forcible rape of Linda [E.] On or about December 16, 1968, during the court-martial proceedings at Fort Riley, Kansas, the defendant, Ralph Michael Yeoman, after advice of counsel, entered a plea of guilty and admitted the forcible rape of Linda [E.] as charged against him. [¶] A military court-martial adjudication does not constitute a prior felony conviction under California Penal Code section 190.3, [factor] (b). This is because a court-martial proceeding has differences in procedures—as opposed to our state court procedure in California—differences in proof and the rights of an accused. [¶] Thus you may consider the fact of the defendant's guilty plea in admission of the crime of forcible rape only as it relates to the proof of other violent crimes within the meaning of Penal Code [s]ection, 190.3 [, factor] (b), a different section we have talked about. [¶] Before you may consider the crime of forcible rape against Ralph Michael Yeoman as it pertains to Linda [E.], it must be proven beyond a reasonable doubt."

grasp the distinction they were asked to draw—does not readily command assent. Jurors are routinely instructed to make similarly fine distinctions concerning the purposes for which evidence may be considered, and we ordinarily presume they are able to understand and follow such instructions. (E.g., *People v. Williams* (2000) 79 Cal.App.4th 1157, 1171 [94 Cal.Rptr.2d 727] [jury presumed to understand and follow instruction not to consider as evidence of guilt a statement taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] and offered only to impeach].) Indeed, we and others have described the presumption that jurors understand and follow instructions as "[t]he crucial assumption underlying our constitutional system of trial by jury." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84]; see *Francis v. Franklin, supra,* 471 U.S. 307, 324, fn. 9.) We see no reason to abandon the presumption in this case, where the relevant instructional language seems clear and easy to understand.

As mentioned, defendant also contends that the prosecutor in closing argument incorrectly described the evidentiary weight to which defendant's guilty plea was entitled. This proposition may be considered either as part of defendant's more general argument that the jury must have misunderstood the limited purpose for which defendant's guilty plea was entered, or as a separate claim of prosecutorial misconduct. Considered either way, the argument lacks merit. The record shows that the prosecutor appropriately described defendant's guilty plea as one of three evidentiary points supporting the People's claim that defendant had raped Linda E. Those three points were Linda E.'s own testimony, the lack of significant impeaching evidence in the record of the court-martial or elsewhere, and, finally, defendant's guilty plea and admission to forcible rape. The import of the prosecutor's remarks about defendant's plea and admission was not that they were conclusive, but that they tended to negate the defense suggestion that the victim might have consented.

In summary, because defendant's guilty plea was admitted to prove violent criminal conduct (§ 190.3, factor (b)) and not a prior felony conviction (*id.,* factor (c)), because there is no reason to believe the jury misunderstood or failed to consider the limiting instruction, and because the prosecutor in closing argument did not use the evidence for a purpose inconsistent with the limiting instruction, we perceive no violation of due process and no risk that the judgment of death was based on evidence that should have been excluded as unreliable.

### 5. *Exclusion of Evidence that a Third Person Killed David Hill*

The defense attempted to prove that David Hill was killed not by defendant but instead by Michael Ayers, Williams Summers and/or James Baxter. (See

*ante,* at p. 111 et seq.) Defendant contends the court abused its discretion under Evidence Code section 352 by sustaining the People's objections to certain questions apparently intended to suggest three additional possible killers—Jerry Huebner and two unidentified persons. We find no abuse of discretion.

Monique Hubertus, called by the People at the penalty phase, identified as having belonged to Hill several unique items found in defendant's possession shortly after the murder. (See *ante,* at p. 111.) On cross-examination, defense counsel asked Hubertus whether she knew "a short time prior to David Hill's death that he had owned an automobile that was the subject of a car burglary" and whether she had subsequently received "a telephone call from one of the suspects of that car burglary." The People objected, and the court excused the jury to consider the matter in camera. After considering it, the court disallowed the questions under *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*), thus in effect exercising its discretion to exclude evidence under Evidence Code section 352, which *Hall* interpreted. We find no abuse of discretion.

In camera, the defense explained the theory on which their questions were based: About a week before Hill was killed, Roseville police had charged two men, including Jerry Huebner, with attempting to burglarize one of Hill's automobiles; the charges were dropped after Hill, the complaining witness, died. According to defense counsel, Huebner had called Hubertus "looking for David Hill, complaining about the fact that if [Hill] didn't withdraw the charges they were going to jail for twelve years." Defense counsel theorized that Huebner, or his unidentified accomplice, murdered Hill to suppress his testimony. Answering the court's question, however, the defense acknowledged that it had no other foundation for this additional theory of third party culpability, such as evidence that Huebner or his accomplice was seen in the vicinity of Hill's house at or about the time of the killing.

Based on this offer of proof, the trial court correctly exercised its discretion to exclude the evidence. ■ Evidence that a third person actually committed a crime for which the defendant has been charged is relevant but, like all evidence, subject to exclusion at the court's discretion under Evidence Code section 352 if its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion. (*Hall, supra,* 41 Cal.3d 826, 834.) The decision in *Hall* guides the exercise of discretion in this context. ■ "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.,* at p. 833.) However, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt

about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*) Here, defendant's offer of proof showed motive only, and was thus insufficient. The court did not abuse its discretion.

The trial court also sustained the People's objection to a question asked by defense counsel of witness Carla Nebeker. Called by the defense, Nebeker testified that she had spoken to Hill at 1:00 or 2:00 o'clock in the afternoon in front of his house about buying one of his trucks. Nebeker lived three houses down from Hill. The People objected under *Hall, supra,* 41 Cal.3d 826, to the further question why she had not returned to Hill's house that evening to finish negotiating. In camera, the defense offered to prove that Nebeker did not visit Hill that evening because Hill had said he would have an important meeting and that Nebeker saw someone walking out of Hill's house about 6:00 p.m. The trial court ruled that defense counsel could ask Nebeker about the unidentified man she had seen leaving Hill's house, but not about the meeting. (See *ante*, at p. 112.)

In so ruling, the court did not abuse its discretion. Nebeker's testimony that an unidentified person unlike defendant in appearance had left the murder site close to the time of the crime was highly relevant. The court thus properly permitted the defense to present this matter to the jury. In contrast, the fact that Hill had mentioned a meeting did not directly or circumstantially connect any identifiable person with the crime. (See *Hall, supra,* 41 Cal.3d 826, 833.) On appeal, counsel suggests that Hill may have planned to meet with Michael Ayers, James Baxter and/or William Summers, some of the persons whom the defense attempted to implicate in Hill's killing. But the law does not require the admission of evidence made relevant only by speculative hypothesis.

Here, as at trial, defendant argues the trial court violated due process by applying Evidence Code section 352 and *Hall, supra,* 41 Cal.3d 826, "mechanistically to defeat the ends of justice" (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 93 S.Ct. 1038]) and, more specifically, to defeat his Eighth Amendment rights to a sentencing determination of heightened reliability (e.g., *Lankford v. Idaho* (1991) 500 U.S. 110, 125, fn. 21 [114 L.Ed.2d 173, 111 S.Ct. 1723]) and to present to the jury any relevant circumstance that could cause it to decline to impose the death penalty (*McCleskey v. Kemp* (1987) 481 U.S. 279, 306 [95 L.Ed.2d 262, 107 S.Ct. 1756]). The argument is not persuasive. ▇▇ We have previously determined that due process does not bar the application of Evidence Code section 352 at the penalty phase of capital trials. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684–685 [248 Cal.Rptr. 69, 755 P.2d 253].) We based this conclusion on the fact that neither due process nor *Chambers v. Mississippi* has led the high court to "question[] the power of States to exclude

evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 106 S.Ct. 2142]; see *People v. Babbitt, supra,* at pp. 684–685.) We see no reason in defendant's argument or the circumstances of this case to reconsider our prior conclusion

6. *Refusal to Instruct on the Use of Circumstantial Evidence (CALJIC No. 2.01) at the Penalty Phase*

Defendant contends the court erred in declining to instruct the jury with CALJIC No. 2.01 at the penalty phase. We find no error.

The purpose of CALJIC No. 2.01 is to clarify the proper use of circumstantial evidence. The instruction explains, among other things, that a finding of guilt "may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion." (*Ibid.*) ■ We have held that the court must give such an instruction on its own motion when the proof of guilt rests substantially on circumstantial evidence. (*People v. Wright* (1990) 52 Cal.3d 367, 406 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1]; see Use Note to CALJIC No. 2.01 (6th ed. 1996) p. 38.) But the instruction need not be given when the circumstantial evidence merely corroborates other evidence (*People v. Wright, supra,* at p. 406; *People v. Williams* (1984) 162 Cal.App.3d 869, 874–876 [208 Cal.Rptr. 790]), because in such cases the instruction may confuse the jury regarding the weight to which other evidence is entitled (*People v. Williams, supra,* at p. 874). In this case, the instruction would have created a risk of confusion by seeming to tell the jury, incorrectly, to reject defendant's extrajudicial admissions of guilt unless they could not be reconciled with any rational conclusion other than guilt.

Defendant contends the People relied substantially on circumstantial evidence to prove he killed David Hill. To be sure, the People introduced much circumstantial evidence, including defendant's presence near the scene of the crime at the relevant time, his possession immediately before the crime of the type of gun that fired the fatal bullets, and his possession after the crime of unique, personal items that had belonged to the victim. (See *ante,* at p. 110 et seq.) Yet the trial court nevertheless declined to give CALJIC No. 2.01 because it felt that the People's proof of this violent criminal act (§ 190.3, factor (b)) rested largely on defendant's extrajudicial admissions to his sister, Linda Ayers, and to her husband, Michael Ayers. (See *ante,* at p. 111.)

Specifically, Michael testified that defendant said before his arrest that he had shot Hill. Linda testified that defendant, in two postarrest calls from jail, admitted he had killed Hill and described him as "a no good drug dealer." In view of these admissions, the trial court reasonably determined for purposes of instructing the jury that the People's case did not rest substantially or exclusively on circumstantial evidence. We have not required an instruction on circumstantial evidence under similar circumstances. (E.g., *People v. Wright, supra,* 52 Cal.3d 367, 406.)

Defendant argues the jury must have rejected the testimony of Michael and Linda Ayers about defendant's extrajudicial admissions as self-serving efforts on their part to avoid suspicion, since Michael knew Hill and since defendant may have used Michael's gun to kill Hill. If the jury did reject the extrajudicial admissions, defendant continues, any conclusion by the jury that defendant killed Hill must have rested entirely on the circumstantial evidence to that effect. The argument is too speculative to accept. In any event, the fact that some evidence may impeach a defendant's extrajudicial admissions does not logically affect the court's instructional responsibilities when the circumstantial evidence merely corroborates those admissions.

In view of these conclusions, we see no reason to accept defendant's further claim that the trial court's failure to give CALJIC No. 2.01 led to an erroneous determination that defendant murdered Hill and thus tilted the balance unfairly towards the death penalty. Nor do we perceive any violation of the federal constitutional provisions defendant perfunctorily cites. (U.S. Const., 4th, 6th, 8th & 14th Amends.)

### 7. *Prosecutorial Misconduct During Closing Argument*

Defendant contends the prosecutor during closing argument made various statements amounting to misconduct. Defendant timely objected to each such statement. While the claims are thus properly before us (*People v. Hill* (1988) 17 Cal.4th 800, 820 [72 Cal. Rptr. 2d 656, 952 P.2d 673]; *People v. Green, supra,* 27 Cal.3d 1, 27), we find no misconduct under state or federal law for the reasons set out below.

#### a. *Death penalty "would be virtually meaningless" if not applied to defendant*

After reviewing the circumstances of Doris Horrell's murder, the prosecutor offered the following argument: "[I]n this case, given these facts and what we know about this defendant, the murder of Mrs. Horrell, I submit to you that the proper measurement of the defendant's crime and the defendant is the death penalty. And, quite frankly, if it were not to be applied in this particular

case, to me it would be virtually a meaningless . . . ." At this point defense counsel objected that the argument was "not proper . . . ." The court overruled the objection, and the prosecutor continued: "It would be, the law would be virtually meaningless. What would be the point of having it?"

On appeal, defendant unconvincingly compares the prosecutor's argument with the different argument we condemned in *People v. Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940]. There, the prosecutor incorrectly asserted that the jurors "do not decide life or death. The law does that." (*Id.*, at p. 928.) This argument, we concluded, violated *Caldwell v. Mississippi* (1985) 472 U.S. 320, 333 [86 L.Ed.2d 231, 105 S.Ct. 2633], by inviting the jurors to believe that the responsibility for choosing between life and death lay elsewhere. (*People v. Farmer, supra*, at p. 928.) In contrast, the prosecutor here merely argued that the penalty phase evidence strongly pointed to death. We described a very similar statement by the prosecutor in *People v. Jones* (1997) 15 Cal.4th 119, 185 [61 Cal.Rptr.2d 386, 931 P.2d 960], as "within the bounds of proper argument." Certainly the prosecutor here did not invite the jury "to minimize the importance of its role." (*Caldwell v. Mississippi, supra*, at p. 333.) Immediately after making the challenged remark, the prosecutor strongly emphasized the jurors' personal responsibility for doing the "very difficult job" of choosing the "just punishment."

### b. Defendant "was literally the judge, the jury and the executioner of Mrs. Horrell"

At one point in his closing argument, the prosecutor asked the jury to remember "the punishment [defendant] inflicted on [Horrell] . . . no due process, no judges, no jurors, no act of the courts. That is not what he did. He was literally the judge, the jury . . . ." At this point the court "noted" but did not sustain defense counsel's objection "to this form of argument." The prosecutor then completed the sentence: "He was literally the judge, the jury and the executioner of Mrs. Horrell." On appeal, defendant acknowledges that the prosecutor's statement was "not meant to be taken literally" but nevertheless construes it as an invitation to employ "frontier justice" "by giving little consideration to factors in mitigation." We find no misconduct.

The statements defendant challenges, read in the context of the prosecutor's entire closing argument, cannot fairly be construed as an invitation to take lightly the sentencing decision or the mitigating evidence. Just before making those statements, the prosecutor had described the sentencing decision as a "very difficult job" that would require "courage" and "introspection." After making that remark, he acknowledged "how difficult it is for probably all twelve of you [jurors] to arrive at what a just and true verdict

ought to be in this case." He then correctly stated that "the lawful process to make this legally right and morally right decision involves a weighing and a balancing of certain factors, or certain circumstances commonly known or referred to in the law as factors in aggravation and factors in mitigation." Finally, the prosecutor concluded this segment of his argument by reading the entire fourth paragraph of CALJIC No. 8.88, which describes the weighing of aggravating and mitigating circumstances. He then began the next segment of his argument, which constituted a detailed examination of the mitigating evidence. Nowhere in his closing argument did the prosecutor suggest, explicitly or implicitly, that the jurors should take lightly either the mitigating evidence or their duty to determine the appropriate penalty according to the law.

### c. *Section 190.3, factor (d), "means what it says"*

Defendant contends the prosecutor's argument about section 190.3, factor (d), misstated the law and led the jury not to consider proper mitigating evidence. Factor (d) directs the jury to ·take into account, if relevant, "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." We find one misstatement of law, which the prosecutor immediately corrected, but no misconduct.

Defendant's argument has three parts. We may easily dispose of the first. The prosecutor did not misstate the law by telling the jury that "the language [of factor (d)] means what it says" and that, consequently, the mental or emotional disturbance referred to therein "has to be extreme." We have held that trial courts should not omit the adjective "extreme" from the language ·of section 190.3, factor (d) when instructing juries. (*People v. Carpenter, supra,* 15 Cal.4th 312, 416; *People v. Benson* (1990) 52 Cal.3d 754, 803–804 [276 Cal.Rptr. 827, 802 P.2d 330].) A fortiori, the prosecutor need not do so in closing argument.

Defendant next claims the prosecutor misstated the effect of section 190.3, factor (d), by saying, "[b]asically, that factor exists for people who are psychotic." Indeed, the statement was incorrect, and defense counsel properly objected on that basis. Factor (d) permits the jury to consider any evidence of "extreme mental or emotional disturbance" (§ 190.3, factor (d)), whether or not the result of psychosis. Immediately after making this statement, however, the prosecutor corrected it by characterizing factor (d) more expansively as describing "people who are so badly disturbed that though they are legally responsible for their crime, they have been found guilty and so forth, that they are so bad that you as a human being and the law and your morality says maybe we ought to consider how screwed up they were and give them a

break. That is why that factor is there." Thereafter, the prosecutor discussed at length the same evidence the defense contended was relevant under factor (d), namely, the disputed evidence that defendant had killed Horrell under the influence of methamphetamine and that he suffered from brain damage. The prosecutor's argument on this point was not that the evidence was irrelevant, but that it was unpersuasive because the circumstances of the crime showed "planning," the deliberate selection of a vulnerable victim, and consciousness of guilt.

Considering the prosecutor's entire closing argument, his erroneous statement that section 190.3, factor (d), was intended "for people who are psychotic" did not amount to misconduct. There was no misconduct under federal law because the statement was immediately corrected and did not infect the trial with such unfairness as to violate due process. (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; see *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642–643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) Nor was there misconduct under state law, because the prosecutor did not use deceptive or reprehensible methods to attempt to persuade the jury, and because it is not reasonably likely the jury construed or applied any of the challenged remarks in an objectionable fashion. (*People v. Morales, supra*, at p. 44.)

Finally on this point, defendant contends that the same remarks by the prosecutor set out above confused the jury about section 190.3, factor (k). To be sure, defendant was entitled to have the jury consider under factor (k) "[a]ny other circumstance which extenuates the gravity of the crime," including, among other things, evidence of nonextreme mental or emotional disturbance. (*People v. Welch* (1999) 20 Cal.4th 701, 769 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Yet we find no reason to believe the prosecutor's closing argument confused the jury on this point. Indeed, the prosecutor described the evidence of defendant's drug use and brain damage as matters implicated by factor (k).

### d. *Evidence of defendant's childhood was a "ploy"*

Defendant's case in mitigation focused on evidence that he had been abused as a child and had not received adequate help for psychological and behavioral problems resulting from the abuse. The defense also introduced family photographs of defendant taken when he was a child. Commenting on this evidence in closing argument, the prosecutor told the jurors: "I'm not asking you to punish some kid. That is not what we are doing here. And don't be fooled by that. Don't be fooled by that ploy in [section 190.3,] factor (k)." Defense counsel objected to the prosecutor's "characterization" of the mitigating evidence and asked the court to admonish the jury that the evidence was

relevant. The court overruled the objection, but did remind the jury of the "wide range of relevancy under [section 190.3,] factor (k) . . . ."

On appeal, defendant claims the prosecutor's use of the word "ploy" suggested to the jury that the mitigating evidence had not been properly admitted and constituted a personal attack on the integrity of opposing counsel. The claim lacks merit. We do not understand the prosecutor's argument as challenging the court's ruling or defense counsel's integrity. Immediately after the court overruled defense counsel's objection, the prosecutor clarified his position: "The point that I was making in going through some of this evidence of poor upbringing, abusive-abused child and its relevance, is that it ignores the obvious in this case," namely, that such evidence "is not an acceptable excuse for a lifetime of moral failure by this defendant." In short, the prosecutor simply argued that the evidence relating to defendant's childhood had little mitigating force and did not warrant sympathy. This he was entitled to do. (*People v. Dennis* (1998) 17 Cal.4th 468, 547–548 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

e. *Victim-impact argument*

Defendant contends the prosecutor committed misconduct by referring in closing argument to the impact of defendant's capital offense on the victim and her family. We find no misconduct.

The subject arose while the prosecutor was discussing the evidence that defendant as a child had been abused by family members. Commenting on that evidence, the prosecutor said: "And you have to kind of be a little careful here. And what happens in these type [of] cases is the case goes along in this trial [and] we first start with the victim, but you really don't—other than the fact she was killed, you don't know anything about her life, her family, her dreams, her home." Defense counsel objected under *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. The court noted but did not sustain the objection. The prosecutor continued: "But what happens, you really never get that type [of] evidence in the case and instead just what happens to her, real sterile here in this courtroom. I'm not eloquent enough to tell you the pain, fear, agony she suffered." The prosecutor concluded this portion of his argument by asking the jury not to confuse their sympathy with defendant's testifying family members with sympathy for defendant himself.

Any claim that the prosecutor's argument violated the Eighth Amendment to the United States Constitution has been preempted by *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597], in which the high court held that capital sentencing juries may consider the specific harm a defendant has caused. As *Payne* explains, " '[t]he State has a

legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Id.*, at p. 825, quoting *Booth v. Maryland, supra*, 482 U.S. 496, 517 (dis. opn. of White, J.).) *Payne* thus overruled *Booth v. Maryland* and *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], which had prohibited victim-impact evidence and argument. (See *Payne, supra*, at p. 830; cf. *People v. Edwards* (1991) 54 Cal.3d 787, 833 [1 Cal.Rptr.2d 696, 819 P.2d 436] [evidence of the specific harm a defendant has caused is admissible as a circumstance of the crime under § 190.3, factor (a)].)

Defendant argues the prosecutor's remarks were improper under state and federal law because they invited the jurors to speculate about facts not in the record. (See, e.g., *People v. Cunningham, supra*, 25 Cal.4th 926, 1026; *United States v. Atcheson* (9th Cir. 1996) 94 F.3d 1237, 1244–1245.) But defendant's argument is belied by his concession that the evidence incidentally showed that Horrell was close to her daughter, granddaughter and friends, who had testified at the guilt phase to establish the facts of the crime. That Horrell had suffered was a fair inference from the evidence, which the prosecutor was entitled to argue. (*People v. Cunningham, supra*, at p. 1026; *United States v. Atcheson, supra*, at p. 1244.) Certainly there was no misconduct. Nothing the prosecutor said on this subject was deceptive or reprehensible, or infected the trial with such unfairness as to violate due process. Nor is it reasonably likely that the jury construed or applied any of the challenged remarks in an objectionable fashion. (*People v. Morales, supra*, 25 Cal.4th 34, 44.)

### f. *Reference to defendant as an "animal"*

Several defense witnesses testified that defendant possessed good character traits. Addressing this testimony, the prosecutor asked the jury not to judge defendant by his quiet, benign appearance but instead by the evidence. "Don't be fooled by appearances," the prosecutor argued. "Now that you know what this evidence is, what this animal is like . . . . " Defense counsel objected, the court overruled the objection, and the prosecutor continued: "The point is, you can try a million murder cases over the years and there is no special mark an individual has when he does murders. He's just like you and me. Sometimes he wears a coat and a tie, sometimes cinched up, sometimes it is not. But there is no special mark that is like a stigma. So don't decide the facts of the case on that. Decide the facts on the evidence."

Based on these remarks, defendant asserts three claims of misconduct. None has merit: (1) The prosecutor's advice to look beyond defendant's

appearance and demeanor and to decide the case based on the evidence was not inappropriate. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1058–1059 [17 Cal.Rptr.2d 174, 846 P.2d 756]; *People v. Price* (1991) 1 Cal.4th 324, 453–454 [3 Cal.Rptr.2d 106, 821 P.2d 610].) (2) While prosecutors should not invoke their personal beliefs or experiences as support for facts not in evidence (e.g., *People v. Medina* (1995) 11 Cal.4th 694, 776 [47 Cal.Rptr.2d 165, 906 P.2d 2]), the prosecutor here did not clearly violate that rule. His words—"you can try a million murder cases over the years and there is no special mark an individual has when he does murders"—merely restated, albeit from the rhetorical stance of a trial lawyer, the common wisdom that appearances can deceive. (3) The prosecutor's reference to defendant as an "animal," even if arguably improper, does not amount to reversible misconduct. While we do not condone the use of opprobrious terms in argument (*People v. McDermott* (2002) 28 Cal.4th 946, 1002 [123 Cal.Rptr.2d 654, 51 P.3d 874]), the prosecutor's single reference to defendant as an "animal" during a closing argument otherwise free of intemperate language cannot reasonably be considered prejudicial misconduct.

### g. *What might have happened to Mrs. Ford*

In closing argument the prosecutor also discussed the robbery and attempted kidnapping of Geraldine Ford, whom defendant had attempted at gun- and knifepoint to force into his truck. During the course of this discussion, the prosecutor observed: "Again, but for the grace of God, Mrs. Ford is a very, very, lucky, lucky woman today to have been able to come into this courtroom and testify to you. [¶] A gun and a knife used in that case. We can speculate, and I don't really want you to get into speculation, but you know what was going to happen." Here, the court overruled defense counsel's objection that the prosecutor was, indeed, asking the jury to speculate. The prosecutor continued: "Let me change the word. We draw reasonable inferences of what was going to happen to Mrs. Ford if he was successful in getting her into the truck. These are reasonable inferences you guys can draw. In this case you don't need it. The actual evidence [of] a rob[bery] and attempted kidnapping, that should be enough."

On appeal defendant renews his claim that the prosecutor improperly invited the jury to speculate about crimes not actually committed. Certainly a prosecutor should not invite the jury to speculate, but here the prosecutor prudently amended his remarks to ask the jury to draw reasonable inferences about defendant's probable intent based on the evidence. This was proper. (*People v. Osband* (1996) 13 Cal.4th 622, 723 [55 Cal.Rptr.2d 26, 919 P.2d 640] [prosecutor in closing argument at the penalty phase permissibly implied that a more serious crime might have occurred had someone not interrupted the defendant's molestation of a 14-year-old girl].) Based on the evidence,

the jury was entitled to draw the reasonable inference that defendant had an unlawful purpose for attempting to force Ford into his truck.

### h. *Evidence that defendant would not be dangerous as a life prisoner was "pure unadulterated speculation"*

The defense called five witnesses to testify that defendant behaved well in custody. Each was or had been employed at a correctional facility. (See *ante*, at p. 113.) The general import of their testimony was that defendant was a reliable, hard worker who avoided trouble. Two witnesses provided more specific grounds for inferring that defendant would not pose a danger to correctional employees or to other prisoners. Ed Dawson had supervised defendant's work on building maintenance projects at Atascadero State Hospital while defendant was confined there as a mentally disordered sex offender. Dawson testified that defendant had been cleared for access to sharp tools and had never had any problems, even though his job was demanding and entailed pressure. Dave Roberts supervised the culinary unit at the California Training Facility at Soledad. He testified that defendant's immediate supervisor gave him an unusually favorable work evaluation, and that life prisoners tended to behave better than other inmates in order to avoid restrictions on their freedom.

Addressing this evidence in closing argument, the prosecutor characterized it as "essentially ask[ing] you to speculate on whether or not he will ever do anything down the line, and who the hell knows? We know he has history. The defense can stand up and say he's been in a lot of institutions and never got in trouble before, but as everybody sits here now, you will never know whether or not you are mortgaging the lives of counselors, workers in the joint . . . ." Defense counsel objected to the argument as "improper." The court overruled the objection, and the prosecutor continued: "That's just pure unadulterated speculation. So don't fall for it. Don't fall for it at all."

On appeal, defendant claims the prosecutor committed misconduct by addressing the subject of future dangerousness in closing argument when "[t]he defense had introduced no testimony on future dangerousness . . . ." But this is incorrect. The defense had introduced the testimony set out above. In any event, when a defendant presents evidence of his capacity to adjust to life in prison, it is permissible for the prosecutor to argue that the evidence is unpersuasive. (*People v. Osband, supra,* 13 Cal.4th 622, 723.) The prosecutor here did no more than that.

### 8. *Challenge to CALJIC Nos. 8.86 and 8.87*

The trial court instructed the jury with CALJIC Nos. 8.86 and 8.87. Using these standard instructions, the court enumerated the other violent criminal

acts (§ 190.3, factor (b)) and prior felony convictions (*id.*, factor (c)) the People had sought to prove as aggravating factors and informed the jury not to consider them unless convinced beyond a reasonable doubt of their truth.

On appeal, defendant claims the instructions violated *People v. Wright, supra,* 45 Cal.3d 1126, 1135–1138, because they argumentatively pinpointed the evidence on which one side relied. In *People v. Robertson, supra,* 33 Cal.3d 21, 55, footnote 19, however, we encouraged the People to request instructions enumerating the other crimes on which they rely as aggravating evidence. Defendant contends that "*Wright* is in conflict with *Robertson* on this point."

The argument lacks merit. The two decisions address different problems. *People v. Wright, supra,* 45 Cal.3d 1126, addresses the problem of apparent bias caused by argumentative instructions that seem to invite the jury to draw certain conclusions from specified evidence. (*Id.,* at p. 1137.) *People v. Robertson, supra,* 33 Cal.3d 21, addresses the danger of confusion that arises from evidence suggesting a defendant has committed crimes other than those of which the People have given formal notice under section 190.3 and sought to prove beyond a reasonable doubt. Absent instructions like CALJIC Nos. 8.86 and 8.87, there is no assurance the jury will consider only proper aggravating evidence. (*People v. Robertson, supra,* at p. 55, fn. 19.) Here, without such instructions, the jury might have attributed incorrect significance to the evidence that defendant stole a firearm from Michael Ayers, possessed methamphetamine, and possessed and attempted to sell property stolen from David Hill's residence. ██ While courts need not give CALJIC Nos. 8.86 and 8.87 sua sponte (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1267 [278 Cal.Rptr. 640, 805 P.2d 899]), we find no error in their use here and no reason to find a violation of the Fifth, Sixth, Eighth and/or Fourteenth Amendments to the United States Constitution, as defendant perfunctorily claims.

### 9. *Refusal to Give Instructions Proposed by Defense—Part 1*

Defendant contends the trial court erred in refusing to give two jury instructions proposed by the defense to highlight specific mitigating evidence. Proposed instruction No. 47 would have noted defendant's admission to police of his guilt in the death of Doris Horrell. Proposed instruction No. 50 would have noted various assertedly mitigating circumstances, including the admission noted above, any lingering doubt concerning defendant's guilt, and the fact that defendant did not attempt to escape from custody or use force to avoid arrest. The same instruction would also have restated section 190.3, factor (k).

Neither state nor federal law supports defendant's claim. ▮ State law does not require instructions highlighting specific mitigating evidence. (*People v. Musselwhite, supra*, 17 Cal.4th 1216, 1269–1270.) Arguing to the contrary, defendant relies on *People v. Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], in which we held that "[a] defendant is entitled to an instruction relating particular facts to any legal issue." But *Sears* does not require argumentative instructions that merely highlight specific evidence without further illuminating the relevant legal standards. (*People v. Musselwhite, supra*, at pp. 1269–1270.) The only legal standard plausibly illuminated by the instructions here at issue was section 190.3, factor (k), which permits the jury to consider all mitigating evidence offered by the defense. But the court adequately set forth that principle by giving CALJIC No. 8.85. Apart from repeating factor (k), the proposed instructions merely argued the evidence.

Nor does federal law support defendant's claim. In *Buchanan v. Angelone* (1998) 522 U.S. 269, 277 [139 L.Ed.2d 702, 118 S.Ct. 757], the United States Supreme Court held that a trial court did not err by instructing a capital sentencing jury simply to consider " 'all of the evidence.' " The trial court was not required to list Virginia's statutory mitigating circumstances or the specific mitigating evidence the defendant wished to highlight. (*Id.*, at pp. 273–274, 276–279.) ▮ If a defendant has properly been found eligible for the death penalty, the high court reasoned, and if the jury has been permitted to consider all constitutionally relevant mitigating evidence, the state may, but need not, further structure the manner in which the jury considers the mitigating evidence. (*Id.*, at p. 276.) In this context, jury instructions violate the Eighth Amendment to the United States Constitution only if there is a reasonable likelihood the jury has understood them as barring consideration of constitutionally relevant evidence. (*Ibid.*) We see no such likelihood here because the trial court instructed the jury with the expanded version of CALJIC No. 8.85 to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the events for which he is on trial."

Defendant contends that the jurors likely believed the law did not permit them to give any mitigating force to the circumstance that defendant admitted his guilt in the killing of Horrell. We see no possibility the jurors labored under such a misunderstanding. Defendant's admissions came into evidence partly at the penalty phase, through Linda Ayers's testimony that he admitted the killing to her in a telephone call from jail, and partly at the guilt phase, through the testimony of defense expert Dr. Rosenthal. The court permitted the doctor, who opined that defendant had killed Horrell under the influence of methamphetamine, briefly to summarize defendant's hearsay statements to

police as part of the basis of his opinion. Defendant, according to Dr. Rosenthal, "report[ed] his sense of being puzzled by what happened" and "that he had actually been using drugs for a long period of time . . . ." The court instructed the jury at the guilt phase not to consider defendant's statements to the police for the truth of the matters asserted therein. Later, however, at the conclusion of the penalty phase, the court expressly gave defense counsel "free rein" to argue the evidence, and counsel told the jury without contradiction that the evidence was indeed relevant.[11] For this reason, and because the court properly instructed the jury with CALJIC No. 8.85, we see no reason to believe the jury was confused on this point.

Defendant unsuccessfully attempts to compare his case with *McDowell v. Calderon* (9th Cir. 1997) 130 F.3d 833. In *McDowell*, the Ninth Circuit held that a trial court violated the Eighth Amendment to the United States Constitution by failing to correct the erroneous stated belief of 11 jurors that the law did not permit them to consider certain mitigating evidence related to the defendant's personal and family history. (*McDowell v. Calderon, supra*, at pp. 837–841.) The jurors had communicated their misunderstanding during deliberations in a note to the court seeking guidance on the matter. (*Id.*, at p. 835.) In the case before us, nothing in the record suggests any juror was similarly confused.

### 10. *Refusal to Give Instructions Proposed by Defense—Part 2*

As we have already explained, neither state nor federal law requires trial courts to give jury instructions cataloging the mitigating evidence. (See *ante*, at p. 152 et seq.; see also *Buchanan v. Angelone, supra*, 522 U.S. 269, 273–274, 276–279; *People v. Musselwhite, supra*, 17 Cal.4th 1216, 1269–1270.) Arguing to the contrary once again, defendant contends the trial court erred in refusing to give his proposed instruction No. 46. The proposed instruction would have enumerated 21 mitigating circumstances, including such things as defendant's "lack of a sense of self esteem and self-worth," his "expressions of concern for others," his "positive contributions while in the state hospital and in prison, in his work and in his poetry," and the fact that he "tearfully admitted his guilt in killing [Horrell] to [Linda Ayers] and expressed his remorse." In declining to give so argumentative an instruction, the court did not err.

Defendant also contends the court's failure to give the proposed instruction violated federal law in a number of respects. While he perfunctorily cites the

---

[11] Defense counsel argued as follows: "you can consider the fact even after his arrest, and Mike Yeoman admitted responsibility to the police for killing Mrs. Horrell, and he expressed a general sense of puzzlement about what he had done. [¶] And you can consider that he admitted his guilt to killing Mrs. Horrell to Linda Ayers, and he expressed his remorse for having done that."

Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, he offers no specific arguments under any of those provisions except as noted below.

Relying on *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227], defendant argues that the court violated due process by arbitrarily refusing to give an instruction pinpointing mitigating evidence at the penalty phase, when defendants are entitled to analogous instructions pinpointing evidence at the guilt phase. The argument fails because the premise is erroneous: In no context is a defendant entitled to an argumentative instruction that simply highlights particular evidence without further elucidating the relevant legal standards. (*People v. Musselwhite, supra*, 17 Cal.4th 1216, 1269–1270; see *ante*, at p. 152.)

Citing *Hitchcock v. Dugger* (1987) 481 U.S. 393 [95 L.Ed.2d 347, 107 S.Ct. 1821], defendant contends the court's failure to give the proposed instruction prevented the jury from understanding the scope of the factors they might consider in mitigation. *Hitchcock* is not apposite. In that case, a Florida trial court had instructed a jury to consider only the mitigating evidence that fell within a restrictive set of statutory mitigating factors; the trial court thus erroneously precluded the capital sentencing jury from considering other constitutionally relevant mitigating evidence. (*Hitchcock v. Duger, supra*, at pp. 398–399; see *Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669].) In contrast, the jury in the case before us was properly instructed with CALJIC No. 8.85 to consider "[a]ny other circumstance" proffered as mitigating evidence. (See § 190.3, factor (k).)

Finally, citing *Wardius v. Oregon* (1973) 412 U.S. 470, 472 [37 L.Ed.2d 82, 93 S.Ct. 2208] defendant contends the trial court violated due process by refusing to give the proposed instruction enumerating mitigating evidence while nevertheless giving CALJIC Nos. 8.86 and 8.87, which enumerate the other violent criminal acts (§ 190.3, factor (b)) and prior felony convictions (*id.*, factor (c)) the People had sought to prove. The decision in *Wardius*, however, merely requires that certain discovery obligations be reciprocal. It does not support defendant's argument. Perhaps drawing a loose analogy to *Wardius*, defendant argues that the trial court "impermissibly tilted the balance in the penalty trial in favor of the prosecution" by refusing the proposed instruction. But CALJIC Nos. 8.86 and 8.87 have no such effect. Instead, they serve the evenhanded goal of preventing the jury from considering evidence suggesting a defendant has committed crimes other than those of which the People have given formal notice under section 190.3 and sought to prove beyond a reasonable doubt. (*People v. Robertson, supra*, 33 Cal.3d 21, 55, fn. 19.)

## 11. *Refusal to Give Instructions Proposed by Defense—Part 3*

Defendant argues the court erred in refusing to give instructions proposed by the defense on sympathy and the benefit of the doubt. We find no error.

The proposed instruction on sympathy is set out in the margin.[12] In essence, the proposed instruction paraphrased the reasons this court gave in *People v. Lanphear* (1984) 36 Cal.3d 163, 167 [203 Cal.Rptr. 122, 680 P.2d 1081], for concluding that juries must be allowed to consider sympathy for the defendant as a mitigating circumstance. The proposed instruction was necessary, defendant claims, because no instruction given in this case informed the jury "that sympathy may be based independently on the abuse which defendant suffered as a child, without a demonstrable connection to the crimes committed as an adult." In fact, such an instruction was given. Through the language of CALJIC No. 8.85, the trial court directed the jury to consider, among other things, "any *sympathetic* or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, *whether or not related to the events for which he is on trial.*" (Italics added.) In any event, the United States Supreme Court has held that even the unadorned language of section 190.3, factor (k) satisfies the requirements of the Eighth Amendment to the United States Constitution in this context. (*Boyde v. California* (1990) 494 U.S. 370, 377–382 [108 L.Ed.2d 316, 110 S.Ct. 1190].) A fortiori, the expanded version of factor (k) set out in CALJIC No. 8.85 must also be satisfactory.

As mentioned, the trial court also declined an instruction proposed by the defense on the benefit of the doubt. The proposed instruction would have told the jurors they "must," if in doubt as to which penalty to impose, "give the defendant the benefit of that doubt and return a verdict fixing the penalty at life without the possibility of parole." Defendant argues that California law requires such an instruction, but we have previously held to the contrary. (*People v. Cunningham, supra,* 25 Cal.4th 926, 1041–1042; *People v. Musselwhite, supra,* 17 Cal.4th 1216, 1270.) Defendant presents no adequate justification for reconsidering that holding.

We find no merit in defendant's conclusory assertions that the trial court, by denying the proposed instructions discussed above, left the jury with

---

[12] Defendant's proposed instruction No. 14 provided: "The jury is permitted to consider mitigating evidence relating to the defendant's character and background precisely because that evidence may arouse sympathy or compassion for the defendant. If a mitigating circumstance or an aspect of the defendant's background or his character called to the attention of the jury by the evidence or its observation of the defendant arouses sympathy or compassion such as to persuade the jury that death is not the appropriate penalty, the jury may act in response thereto and opt instead for life without possibility of parole."

open-ended discretion to impose the death penalty, precluded the jury from giving the defendant the benefit of its individualized sentencing discretion, rendered the death verdict arbitrary, capricious and unreliable, or violated the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

12. *Refusal to Give Instructions Proposed by Defense— Part 4*

Defendant contends the trial court committed three additional errors in instructing the penalty phase jury. We find none.

First, the trial court did not err in refusing to instruct the jury that the statutory aggravating factors were exclusive. Lacking such an instruction, defendant contends, the prosecutor was free to rely on nonstatutory aggravating factors in his closing argument. Defendant's premise and conclusion are both incorrect. Nothing in the instructions given by the court suggested the jury might properly consider nonstatutory aggravating factors. In fact, the court strongly suggested the contrary by directing the jury to "consider, and take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed." (CALJIC No. 8.88.) CALJIC No. 8.85 freed the jury to consider nonstatutory *mitigating* factors by explaining section 190.3, factor (k), but no instruction did the same for aggravating factors. Furthermore, defendant does not persuade us that the prosecutor did in fact argue nonstatutory aggravating factors. The prosecutor's fleeting reference to the impact of defendant's crimes on Horrell's relatives was a permissible reference to a statutory aggravating factor, namely, the circumstances of the crime. (§ 190.3, factor (a); see *People v. Edwards, supra,* 54 Cal.3d 787, 833; see also *ante,* at p. 147 et seq.) Nor did the prosecutor argue future dangerousness as a nonstatutory aggravating factor. As we have already explained, he merely asked the jury to reject defense counsel's speculation that defendant would not be dangerous if sentenced to life without the possibility of parole. (See *ante,* at p. 150.)

██ Second, the court did not err in instructing the jury to consider defendant's molestation of Sharon C. both as violent criminal conduct (§ 190.3, factor (b)) and as a prior felony conviction (*id.,* factor (c)). On appeal, defendant argues the court erroneously directed the jury to double-count defendant's prior offense. We have rejected identical arguments many times before. (E.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1154 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *People v. Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741].) The argument lacks merit because factors (b) and (c) serve the different purposes of showing, respectively, a defendant's propensity for violence and his failure to be deterred by past criminal sanctions. (*People v. Melton, supra,* at p. 764.) In any event, the concept of counting has no real significance in this context. ██ Jurors

are directed not to count aggravating and mitigating factors in a mechanical way but, instead, to assign to each whatever moral or sympathetic value they deem appropriate. (CALJIC No. 8.88; see *People v. Brown* (1985) 40 Cal.3d 512, 541 [230 Cal.Rptr. 834, 726 P.2d 516].)

Third, the court did not err in instructing the jurors that, to return a verdict of death, they need not unanimously agree on the weight or significance to be given each aggravating and mitigating circumstance. (*People v. Bacigalupo, supra*, 1 Cal.4th 103, 147.) Nor do we see any flaw in the trial court's extemporaneous instruction on this point, which correctly described California law as requiring a unanimous verdict but permitting the jurors to arrive at that verdict "by twelve separate routes." To be sure, as defendant argues, to require unanimity on the treatment of each sentencing factor would increase the People's burden and thus offer defendants more protection. We said as much in *People v. Jackson* (1980) 28 Cal.3d 264, 357 [168 Cal.Rptr. 603, 618 P.2d 149]. But it does not logically follow that the absence of such a requirement biases the jury in favor of death when each juror must decide for himself or herself "whether the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88.)

Briefly addressing federal law, defendant argues that the trial court's instructions to the jury on the three matters discussed above violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. We perceive no credible federal claim. In particular, we see no reason to believe the trial court caused the death judgment to be unreliable or arbitrary for Eighth Amendment purposes by failing to instruct the jury that the statutory aggravating circumstances were exclusive. Other properly given instructions suggested as much, and the prosecutor did not argue nonstatutory aggravating factors. (See *ante*, at p. 156.) Nor are we persuaded that the jury was biased in favor of death because the instructions referred twice to defendant's molestation of Sharon C., or because no instruction told the jurors they had to agree on the significance and weight to be assigned to each sentencing factor. The jurors were instructed not to count factors mechanically, and each juror was permitted to assign to each factor whatever sympathetic or moral weight he or she deemed appropriate. (See *ante*, at p. 156.) The decisions on which defendant relies (*Zant v. Stephens* (1983) 462 U.S. 862, 884–891 [77 L.Ed.2d 235, 103 S.Ct. 2733]; *Godfrey v. Georgia* (1980) 446 U.S. 420, 427–433 [64 L.Ed.2d 398, 100 S.Ct. 1759]) address the constitutional ramifications of using vague factors to determine a defendant's eligibility for the death penalty. They are not apposite.

### 13. *Juror Misconduct*

Defendant unsuccessfully moved for a new trial on the ground of jury misconduct. On appeal, defendant contends the trial court abused its discretion in denying the motion, in failing to conduct an evidentiary hearing, and in failing to issue subpoenas to compel the testimony of jurors who had declined to speak with defense investigators. Defendant also contends the alleged misconduct, and the trial court's rulings, violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. All of these claims lack merit.

Defendant raises four claims of misconduct. In each, he asserts that jurors brought to their deliberations extraneous information derived from their personal knowledge and experience rather than the evidence at trial. We review such claims under the standards set out in *In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985]: "To summarize, when misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test."

The evidence of misconduct consists of declarations prepared by the defense for Jurors Mary Ann F., Karen H., Michael L., Carol M. and Peg P. The declarations repeat, with fair consistency, remarks attributed to the various jurors claimed to have committed misconduct. The defense submitted these declarations in support of the motion for a new trial. The defense also submitted declarations by defense investigators repeating statements by Jurors Robert A. and Franklin K., who had refused to sign declarations. The trial court did not expressly determine the admissibility of these statements, but they are generally consistent with the signed declarations and appear to add to them nothing of significance. Finally, the defense submitted declarations by defense counsel naming jurors who had chosen not to cooperate in their investigation of alleged misconduct.

### a. *Drug screening procedures*

Defendant's first claim concerns Juror Donald P., who apparently repeated during the guilt phase deliberations secondhand information about drug

screening procedures at the Sacramento County jail. According to the declarations, Donald P. told the other jurors that he was married to a nurse who was friendly with a nurse currently working at the county jail, possibly defense witness Lorraine Andrews, R.N. Donald P. also told the other jurors that according to his wife, a person who is arrested and brought to jail is carefully screened for drug use or withdrawal and that, if either is noted, the matter is documented and therapy begun. As a prospective juror, Donald P. had disclosed on his questionnaire the information that his wife was a nurse formerly employed by the county health department and that he, himself, was friendly with a prison physician. While all the prospective jurors were asked to review a list of potential witnesses, the name of defense witness Andrews did not appear on the list. No declarant asserts that Juror Donald P. claimed to have spoken with his wife or any other person about the case during the jury's deliberations.

Juror Donald P.'s remarks might conceivably be viewed as extraneous information of conceivable relevance to the case, and thus misconduct. The defense had attempted to defeat the People's robbery-murder special circumstance allegation by showing that defendant did not form the intent to rob victim Doris Horrell until after killing her because he was under the influence of methamphetamine. Defense witness Andrews, who as a nurse examined jail inmates for health problems, testified that she did not test defendant's blood for drugs, even though he had reported recent drug use. Conceivably, Juror Donald P.'s information about drug screening procedures might have caused him to believe, or suggested to other jurors, that defendant must not have appeared to be under the influence of drugs at the time he arrived at the county jail.

While Juror Donald P.'s remarks were arguably improper, we perceive no substantial likelihood that the remarks indicated bias on his own part or caused any other juror to become biased. (See *In re Carpenter, supra,* 9 Cal.4th 634, 653.) Defendant killed Doris Horrell on February 13, 1988. He was arrested on February 16 and examined by Nurse Andrews on February 22. Whether or not defendant appeared to be under the influence of drugs on February 22, or even on February 16, had little apparent relevance to his mental state on February 13. Whether defendant ever used drugs was not at issue; many witnesses testified that he frequently did. Instead, the material disputed fact was whether defendant on February 13 formed the intent to rob Horrell before or while killing her. The evidence properly admitted at trial on that issue included substantial evidence of rational activity preceding and following the crime, in which defendant posed as a good Samaritan to lure a stranded, vulnerable motorist into his car, killed her, removed her jewelry and other valuable possessions, calmly admitted to Debra Stafford what he had done, immediately returned to the scene of the crime to destroy and conceal evidence, and surveyed the victim's house but abandoned a contemplated

burglary as too risky in view of the good lighting and the presence of neighbors. (See *ante*, at p. 104 et seq.)

Viewed thus in the light of the entire record, we cannot say that Juror Donald P.'s extraneous information about drug screening procedures at the county jail was inherently and substantially likely to have indicated bias on his own part or caused any other juror to become biased. Nor does it appear substantially likely, looking to the nature of the juror's remarks and the surrounding circumstances, that he or any other juror was, on account of the statements, actually biased against defendant. (See *In re Carpenter, supra*, 9 Cal.4th 634, 653.)

### b. *"Sociopath"*

In his second claim of misconduct, defendant asserts that Juror Mary Ann F., a nurse, brought extraneous information to the jury's deliberations by explaining the term "sociopath" and how it might apply to defendant. The record does not clearly show that any misconduct occurred. Nevertheless, assuming for the sake of argument that misconduct did occur, we find no substantial likelihood that any juror was biased. (*In re Carpenter, supra*, 9 Cal.4th 634, 653.)

The term "sociopath" was not used at trial, but the prosecutor did use the similar term "antisocial personality disorder" in cross-examining two defense expert witnesses. These witnesses were Dr. Fred Rosenthal, the psychiatrist and psychologist who testified at the guilt phase that defendant probably was under the influence of methamphetamine when he killed Doris Horrell, and Dr. Mindy Rosenberg, the psychologist who testified at the penalty phase about defendant's social history and the effects of child abuse. To each expert, the prosecutor posed questions apparently intended to explore whether the diagnostic label in question might apply to defendant. The defense unsuccessfully objected to these questions as beyond the scope of direct examination. Answering the questions, both experts testified that they had not been asked to diagnose defendant. Neither opined that the label "antisocial personality disorder" did, or did not, apply. During the guilt phase, the court offered to instruct the jury, if necessary, that there was "no evidence that [defendant] has or has not been diagnosed as having an antisocial personality or is a so-called psychopath." Ultimately, however, the court gave no such instruction because the prosecutor did not refer to the concept in argument at either phase of the trial. The defense briefly mentioned the concept in its guilt phase closing argument, but only to say the concept was not relevant.

The testimony, objections and argument about "antisocial personality disorder" and "psychopath[s]" apparently led to discussion among the jurors. In

her declaration, Juror Mary Ann F. stated: "During deliberations we discussed the meaning of the term sociopath. We tried to describe what we felt sociopath was. We also discussed why the defense objected to testimony about the subject."[13] The same juror also declared: "Because of my career as a nurse, the jurors fielded medical type questions to me. Some of these questions were beyond my area of expertise and I did not attempt to answer them." Juror Carol M. similarly declared that Juror Mary Ann F. "helped us in explaining psychological terms and diagnoses. She told us some of what she learned in her nurse[']s training; For example she used the term sociopath and explained how it might apply to Michael Yeoman." Juror Michael L. declared more cryptically that Juror Mary Ann F. "explained some medical terms to us."

Certainly a juror commits misconduct by asserting a "claim to expertise or specialized knowledge of a matter at issue." (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468].) Yet "it is not improper for a juror, regardless of his or her educational or employment background, to express, an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*Ibid.*; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1265–1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) The evidence presented here does not show that Juror Mary Ann F. offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial. No declaration suggests the juror made any assertion inconsistent with the properly admitted evidence and testimony. Moreover, defendant does not claim, and the declarations do not suggest, that the juror brought reference materials to the jury room, consulted such materials outside the jury room, or spoke with anyone other than jurors about the case. For these reasons we doubt whether the evidence actually establishes that misconduct occurred. "Indeed, lay jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process." (*People v. Pride* (1992) 3 Cal.4th 195, 268 [10 Cal.Rptr.2d 636, 833 P.2d 643].) That they do so is both a strength of the jury system and a weakness that must be tolerated. (*Ibid.*)

Nevertheless, assuming for the sake of argument that the juror's remarks did entail misconduct, reviewing the entire record we find no substantial likelihood that any juror was biased. (*In re Carpenter, supra,* 9 Cal.4th 634, 653.) Juror Mary Ann F.'s remarks about the term "sociopath," as reported in the various jurors' declarations, are not inherently and substantially likely to

---

[13] Because no attorney or witness had used the term "sociopath" at trial, we assume the jurors used the term as a colloquial way of referring to a person with antisocial personality disorder, in much the same way defense counsel used the term "psychopath" in closing argument.

indicate bias on her part or to have influenced any juror. Nor, in view of the nature of the juror's remarks and the surrounding circumstances, is it substantially likely that any juror was actually biased against defendant. (*Ibid.*)

### c. *Jurors' experiences with drugs*

Defendant also claims that several jurors committed misconduct by recounting personal experiences involving drugs. According to the declarations, Juror Mary Ann F. described her brother's abuse of and withdrawal from drugs; Juror Peg P. told how her son was arrested and straightjacketed after using drugs and brandishing a gun; and Juror Robert A. described his own use of and reactions to various drugs. Defendant argues these jurors thereby acted as "pseudo-experts," rebutting the defense claim that defendant's conduct was related to his drug use. We find no misconduct. The effect of drugs, while certainly a proper subject of expert testimony, has become a subject of common knowledge among laypersons. On this subject, as we recognized in *People v. Fauber, supra,* 2 Cal.4th 792, 839, "[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room." (See also *People v. Steele, supra,* 27 Cal.4th 1230, 1265–1267.)

### d. *Life without parole, release and escape*

Defendant claims a juror committed misconduct by remarking during deliberations that defendant might escape from prison if sentenced to life without the possibility of parole. The claim is based on the declaration of Juror Karen H., who stated "[t]hat during the penalty deliberation someone brought up whether [defendant] might escape if given life without parole." The juror continues: "Someone made a 'crack' about this . . . it was not discussed in any way." It thus appears the remark was intended, however inappropriately, as sarcasm or in jest. While the remark might literally be described as injecting an extraneous fact into the jury's deliberations, or as speculation about facts not in evidence, few verdicts would stand if held to such an impossible standard. (*People v. Pride, supra,* 3 Cal.4th 195, 268; see *In re Carpenter, supra,* 9 Cal.4th 634, 654–655.) Reasoning that "[t]he average juror undoubtedly worries that a dangerous inmate might escape" (*People v. Pride, supra,* at p. 268), we concluded in *Pride* that a prison employee's far more detailed remarks to his fellow jurors about the possibility of escape did not constitute misconduct (*ibid.*). The same reasoning more easily justifies a similar conclusion here.

Defendant also claims the jurors committed misconduct by discussing the possibility of parole. The claim is based on the declaration of Juror Mary Ann F.,

who stated: "It was brought up by one juror that if we gave [defendant] life without parole, he'll probably get out in seven years. This seemed like an off hand comment." The claim is also based on the declaration of defense investigator Margaret Erickson, who asserts that Juror Robert A. told her "[t]he jurors discussed whether or not life without parole really means what it says" and that, "[i]n terms of [defendant's] being released in the future, there was concern about revenge."[14]

Accepting as true for the sake of argument all of defendant's assertions about juror misconduct, we find no substantial likelihood of bias. (*In re Carpenter, supra*, 9 Cal.4th 634, 653.) We have recognized that jurors cannot always be effectively precluded from discussing such topics of general awareness and concern as the possibility of parole (*People v. Mendoza* (2000) 24 Cal.4th 130, 195 [99 Cal.Rptr.2d 485, 6 P.3d 150]), escape (*People v. Pride, supra*, 3 Cal.4th 195, 268), and the infrequent nature of executions (*People v. Majors* (1998) 18 Cal.4th 385, 421 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Cox* (1991) 53 Cal.3d 618, 696 [280 Cal.Rptr. 692, 809 P.2d 351]). ▉ Thus, in *People v. Mendoza*, we upheld a trial court's finding that the jurors in a capital case did not commit misconduct by discussing briefly the possibility of parole during the course of penalty phase deliberations that otherwise properly focused on the facts of the case and the aggravating and mitigating circumstances. (*Mendoza, supra*, at p. 195.) The evidence in this case offers no justification for a different conclusion. Assuming for the sake of argument that the statements defendant challenges might be viewed as misconduct, we perceive in them no substantial likelihood of bias, either inherently or in view of their nature and the surrounding circumstances. (*In re Carpenter, supra*, at p. 653.)

Nor did the trial court abuse its discretion in declining to conduct an evidentiary hearing on the defense allegations of jury misconduct or in failing to compel jurors to testify. While these procedural tools are available to trial courts, not every allegation of misconduct justifies their use. We have emphasized that evidentiary hearings should not be used as fishing expeditions to search for possible misconduct. ▉ Instead, such hearings should be conducted only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Moreover, even when the defense has made such a showing, an evidentiary hearing will generally be unnecessary unless the evidence presents a material conflict that can be resolved only at such a hearing. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260].) In this

---

[14] By repeating this evidence, we do not suggest that the hearsay statements of the defense investigator would necessarily be admissible to prove the facts asserted, namely, what Juror Robert A. said in the jury room.

case,the affidavits submitted by the defense did not demonstrate a strong possibility that prejudicial misconduct had occurred.

### 14. *Jury Unanimity on Other Violent Criminal Conduct*

Defendant contends the trial court erred in instructing the jurors they did not need to agree on whether any particular violent criminal activity offered as evidence in aggravation (see § 190.3, factor (b)) had occurred. In so doing, the court used standard language drawn from the last paragraph of CALJIC No. 8.87.[15] Defendant unsuccessfully objected to the instruction, proposed an alternative instruction that did not mention unanimity, and renewed the objection in his motion for a new trial.

■ The claim lacks merit. California law does not require the jurors to agree on instances of criminal activity offered as aggravating evidence under section 190.3, factor (b) . (*People v. Raley* (1992) 2 Cal.4th 870, 910 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Ghent* (1987) 43 Cal.3d 739, 773–774 [239 Cal.Rptr. 82, 739 P.2d 1250].) Nor does the absence of any such requirement render a judgment of death unreliable for Eighth Amendment purposes. (*People v. Raley, supra,* at p. 910; *People v. Bacigalupo, supra,* 1 Cal.4th 103, 135.) Defendant claims that factor (b) also violates the Eighth Amendment to the United States Constitution in not requiring the jurors to agree unanimously on violent criminal activity and, thus, in failing to narrow adequately jurors' discretion to impose the death penalty. (See *McCleskey v. Kemp, supra,* 481 U.S. 279, 305.) The claim fails because the required narrowing function is performed in California by the special circumstances set out in section 190.2, rather than by the aggravating and mitigating factors set out in section 190.3. (*Pulley v. Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Whitt* (1990) 51 Cal.3d 620, 659–660 [274 Cal.Rptr. 252, 798 P.2d 849].)

### 15. *Miscellaneous Constitutional Challenges to the Death Penalty*

Defendant asserts a variety of challenges, under the Eighth and Fourteenth Amendments to the United States Constitution, to the procedures under which the death penalty is imposed in California. We have previously considered and rejected each claim. Defendant offers no persuasive reason to reconsider our prior decisions. More specifically:

a. ■ Trial courts need not delete from the list of sentencing factors set out in CALJIC No. 8.85 those that may not apply. (*People v. Ghent,*

---

[15] The court instructed: "It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. [¶] If a particular juror is not so convinced, that juror must not consider that evidence for any purpose."

*supra,* 43 Cal.3d 739, 776.) The failure to do so does not deprive defendant of his rights to an individualized sentencing determination (*People v. Turner* (1994) 8 Cal.4th 137, 207–208 [32 Cal.Rptr.2d 762, 878 P.2d 521]) or to a reliable judgment (*People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129]).

b. ■ The jury need not prepare written findings identifying the aggravating factors on which it relied. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1232 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Nor does the absence of any such requirement violate defendant's right to meaningful appellate review. (*Ibid.*)

c. ■ The jury need not find beyond a reasonable doubt the truth of the aggravating factors on which it relies, that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Boyette* (2002) 29 Cal.4th 381, 466 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The absence of any such requirement does not render a death judgment unreliable, or violate due process or equal protection. (*Id.,* at p. 465.)

d. ■ The court need not review a death judgment for proportionality with sentences in other cases. (*Pulley v. Harris, supra,* 465 U.S. 37, 50–51; *People v. Bradford, supra,* 15 Cal.4th 1229, 1384.)

e. ■ The adjectives "extreme" and "substantial" do not render vague the sentencing factors that include those words. (§ 190.3, factors (d) & (g); see *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Nor do those adjectives bar consideration of proper mitigating evidence, since factor (k) permits the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime." (§ 190.3, factor (k); see *People v. Benson, supra,* 52 Cal.3d 754, 803–804.)

f. ■ California's statutory special circumstances (§ 190.2, subd. (a)(1)–(22)) are not so numerous or inclusive as to fail to narrow the class of murderers eligible for the death penalty. (*People v. Michaels, supra,* 28 Cal.4th 486, 541.)

g. ■ To give the district attorney of each county the discretion to decide whether to seek the death penalty does not render such decisions arbitrary, even in the absence of statewide standards for, or oversight of, such decisions. (*People v. Holt, supra,* 15 Cal.4th 619, 702.)

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—I concur in the majority opinion. I offer these additional thoughts on defendant's contention that the prosecutor peremptorily challenged four Black jurors because of their race, in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). In rejecting that contention, the majority makes several references to this court's very recent decision in *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270] (*Johnson*), in which I dissented. As I shall explain, *Johnson* is superficially similar but fundamentally different from this case.

A trial court may deny a *Wheeler* motion outright if the moving party has failed to make a prima facie showing that impermissible group bias motivated the opposing party's challenges. In *Johnson*, a majority of this court held that to establish a prima facie case, "the objector must show that it is *more likely than not* the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*Johnson, supra,* 30 Cal.4th at p. 1306, italics added.) I disagreed. As I explained, to establish a prima facie case the objecting party need only "prove facts that, if unexplained, permit a *reasonable inference* of discriminatory purpose." (*Id.,* at p. 1329 (dis. opn. of Kennard, J.), italics added.)

But the discussion in *Johnson, supra,* 30 Cal.4th 1302, on what it takes to establish a prima facie case of group bias in challenging prospective jurors has nothing to do with the issue here. That discussion pertains only to the standard of proof the *trial court* must use to determine a prima facie showing of group bias. Here, defendant claims the court *misapplied* that standard to the facts. In reviewing that claim, the majority here correctly applies the standard for *appellate review* of a trial court's determination that a moving party did not make a prima facie showing, rather than the standard that the *Johnson* majority said the trial court should use.

In *Johnson*, the majority upheld the trial court's ruling that the defendant had not made a prima facie showing of group bias. I disagreed. I explained: "[D]efendant showed that the prosecutor challenged all three Blacks on the jury panel, used a disproportionate number of his peremptory challenges against members of that racial group, and failed to engage in any questioning whatever of any these prospective jurors notwithstanding invitations to do so by the trial court. With respect to two of the three jurors, there is nothing in their oral or written responses that stands out to show they would be unacceptable jurors." (*Johnson, supra,* 30 Cal.4th at p. 1340 (dis. opn. of

Kennard, J.).) This aspect of my dissent in *Johnson* was based on the facts of that case, not on any disagreement with the underlying legal principles. This case presents a different factual pattern. Defendant argued that the prosecutor's challenges of four prospective Black jurors were motivated by group bias. With respect to one of those jurors, the trial court found a prima facie case and, after hearing the prosecutor's explanation, concluded that the challenge was not based on group bias. As to the remaining three prospective jurors, the trial court ruled that defendant had not made a prima facie case of group bias. I agree with the majority that these jurors' oral and written responses on voir dire afforded the prosecution race-neutral reasons for its peremptory challenges. Thus, unlike *Johnson*, the majority here properly upholds the trial court's ruling that defendant failed to make a prima facie showing that the prosecutor's peremptory challenges were based on group bias. On that basis, I concur in the majority's opinion.

Appellant's petition for a rehearing was denied October 1, 2003.